UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,                      CRIMINAL NO. 09-20224

v.                               DISTRICT JUDGE VICTORIA A. ROBERTS

KATRINA LYONS (D-11),         MAGISTRATE JUDGE VIRGINIA M. MORGAN

        Defendant.[1]
_____/

### REPORT AND RECOMMENDATION TO DENY DEFENDANT KATRINA LYONS' MOTION TO SUPPRESS (D/E #114)

## I. Introduction

This matter comes before the court on defendant Katrina Lyons' Motion to Suppress

(D/E #114).[2] The government filed a response in opposition to the motion (D/E #136) and this

court heard oral arguments with respect to the motion on January 11, 2010 and January 12, 2010.

_____

[1]Defendant Katrina Lyons was indicted along with ten co-defendants: George Williams, Brandon Williams, Nancy Williams, Yolando Young, Ernest Larry Adams, Webb Smith, Neil Chapple, Gregory Palmer, Nathaniel Darryl Williams, and Anthony Richardson.

[2]Co-defendant Adams (D/E #132) joined in Lyons' motion. However, while Adams makes similar arguments as Lyons in his own motion to suppress, with respect to a different traffic stop (D/E #131), he does not have any standing to assert a Fourth Amendment violation here because he did not have an expectation of privacy in Lyons' car or the evidence seized. See, e.g., United States v. Waller, 426 F.3d 838, 843-844 (6th Cir. 2005) (stating that, because Fourth Amendment rights are "personal," a defendant at a suppression hearing must show a legitimate expectation of privacy in the place searched or the thing seized) (internal quotation omitted).

For the reasons discussed below, the court recommends that defendant Lyons' motion be **DENIED** and that the evidence obtained or derived from the September 25, 2008 traffic stop not be suppressed.

## II. Background

### A. Indictment

In this case, defendant Lyons and ten co-defendants are charged together in an Indictment (D/E #4). In the "General Allegations" section of the indictment, the government alleges that the named defendants and others engaged in a scheme and pattern of illegal conduct involving prescription drug controlled substances and fraudulent health care billings. (Indictment, p. 1) The Indictment alleges that George Williams organized and operated a purported health care business under the name Quick Response Medical Professionals, P.C. ("QRMP"). (Indictment, pp. 1-2) Brandon Williams and Nancy Williams assisted in the creation and operation of QRMP. (Indictment, p. 3) Brandon Williams and Nancy Williams are also alleged to have caused fraudulent Medicare billings in connection with QRMP. (Indictment, p. 3)

According to the Indictment, George Williams recruited fake patients to see doctors employed by QRMP, with QRMP employee Yolanda Young scheduling the visits and instructing the patients to ask for particular controlled substance prescriptions with a high street value. (Indictment, p. 2) Other employees of QRMP included Gregory Palmer and Darryl Williams, who transported most of the patients, and Anthony Richardson, who worked as a security guard protecting the cash and keeping order. (Indictment, p. 2)

The patients were paid up to $220 for their time and use of their Medicare card, but they did not retain the prescriptions. (Indictment, p. 2) The prescriptions were retained by George Williams, who had them filled at various cooperating pharmacies. (Indictment, p. 2) The controlled substances were then picked up by George Williams, Webb Smith, and/or Ernest Larry Adams. (Indictment, p. 2) Employees such as Smith or Adams were then directed to deliver the controlled substances to distributers in exchange for money. (Indictment, p. 2) One of the alleged distributers was Katrina Lyons. (Indictment, pp. 2-3)

Katrina Lyons is charged in Count One ("21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances"); Count Five ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances - Cough Syrup with Codeine"); and Count Eighteen ("Forfeiture Allegations (18 U.S.C. 981(a)(1)(C), and 28 U.S.C. 2461(c); 21 U.S.C. § 853)"). Count Five relates specifically alleges that Lyons possessed cough syrup with codeine, with an intent to distribute, on September 25, 2008.

### B. Motion to Suppress

On November 17, 2009, defendant Lyons filed a motion to suppress (D/E #114). In that motion, Lyons argues that any evidence obtained or derived from a September 25, 2008 traffic stop of her vehicle should be suppressed because the traffic stop was made without the required degree of cause necessary legally to justify the police action. According to Lyons, there is insufficient evidence from which to find probable cause to conclude that any object in fact

obstructed her vision.  Lyons also notes that, given the incomplete police report[3] regarding the

stop, the reported reasons for the stop were a pretense and the real reason for the stop was the

request of DEA agents.  Lyons further argues that none of the reported observations of the DEA

establish a reasonable suspicion of conduct that could have justified the subsequent State Police

stop.  Lyons also asserts that, because the initial justification for the stop was invalid, the court

need not determine the validity of the purported consent in this case in order to grant her motion

to suppress.

On January 4, 2010, the government filed a response to Lyons' motion to suppress (D/E

#136).  In that response, the government argues that the collective knowledge of the DEA and

the state police provided probable cause to search Lyons' vehicle pursuant to the automobile

exception to the warrant requirement of the Fourth Amendment.  The government also argues

that, as an alternative ground, the violation of a traffic law justified the stop of Lyons' vehicle

and she consented to the subsequent search.

On January 11, 2010 and January 12, 2010, this court conducted an evidentiary hearing

and heard oral arguments with respect to Lyons' motion.

On January 15, 2010, Lyons filed a supplemental brief in support of her motion to

suppress (D/E #145).  In that brief, Lyons argues that the DEA agents did not have cause to

effectuate a traffic stop based on their surveillance, the Michigan State Police did not have cause

to conduct a traffic stop because an air freshener or beads attached to her rearview mirror was

---

[3]The Michigan State Police Report, dated September 25, 2008, is attached as Exhibit A to
Defendant's Motion to Suppress (D/E #114).

not a violation of the Michigan Motor Vehicle Code, and that, based on a totality of the circumstances, the Michigan State Police did not have defendant's valid consent to search her vehicle.

On January 22, 2010, the government filed a supplemental response brief (D/E #150). In that brief, the government argues that the stop of Lyons' vehicle was based on probable cause or reasonable suspicion of a drug offense. The government also suggests that the equipment stop suggested in the testimony provides an alternate basis for stopping the vehicle. The government further argues that the search of Lyons' vehicle was valid based on both probable cause and consent.

On January 27, 2010, Lyons filed a supplemental reply brief in support of her motion to suppress (D/E #153). In that reply brief, Lyons argues that the law relied on by the prosecution to justify the State police officers' conduct is insufficient and that the testimony at the suppression hearing does not support the government's reliance on the collective knowledge doctrine.

## C. Evidentiary Hearing

Three witnesses testified at the evidentiary hearing. The first witness to testify at the evidentiary hearing was Special Agent Kevin Graber of the Drug Enforcement Administration ("DEA"). Special Agent Graber testified that, on September 25, 2008, he was assigned to an enforcement group tasked with assisting an investigation led by Special Agent Christopher Dziedzic. In particular, on that day, Special Agent Graber was assisting in the surveillance of a two-flat house located at 20226 Stratford in the city of Detroit.

Prior to September 25, 2008, Special Agent Graber had been briefed on the details of the investigation and he knew what he was being tasked to watch for. According to Special Agent Graber, he knew that a traffic stop had been conducted in Ohio by the Wood County Sheriff's Department in June of 2007 and that those police officers had discovered 61 bottles of codeine cough syrup prescribed by a Dr. Ebreo.[4] Special Agent Graber did not know who the driver of the stopped vehicle was, but he knew that the stopped vehicle had a Kentucky license plate. Special Agent Graber also testified that, in his experience, southern states are the usual recipients of drugs such as codeine cough syrup and that the drugs' street value rises the further south one goes.

Special Agent Graber further testified that he knew of two other relevant traffic stops that occurred prior to September 25, 2008. In April of 2008, an individual named Andrew Shepard had been stopped in Kentucky while possessing codeine cough syrup, Oxycontin, and Xanax. According to Special Agent Graber, that traffic stop was linked to this case because of jailhouse phone calls made from Shepard to defendant George Williams indicating that George Williams was involved in the events surrounding that traffic stop. The third traffic stop discussed by Special Agent Graber occurred on July 3, 2008, and, during that traffic stop, a vehicle with out-of-state registration was stopped in Michigan. The driver stopped on that date was found with Oxycontin and cough syrup prescribed by Dr. Ebreo.

In addition to knowing about those traffic stops prior to September 25, 2008, Special Agent Graber testified that he had listened to phone conversations through a wiretap of

---

[4]Dr. Ebreo is not charged as a defendant in this Indictment.

defendant Yolando Young's cell phone. According to Special Agent Graber, from those intercepted communications, he learned that George Williams was employing Dr. Ebreo to come to the Stratford residence and see "fake" patients. The "fake" patients were recruited by the defendants' organization and brought to the Stratford residence, where they would be prescribed Xanax, Oxycontin, and codeine cough syrup. The patients would leave the residence with a cash payment, but no prescription. The prescription would stay at the house and later be filled by George Williams or one of his subordinates. After being filled, the drugs would be distributed to people like the ones stopped in traffic stops.

Special Agent Graber testified that he had been conducting surveillance off-and-on at the Stratford residence since August of 2008. During that time, he typically saw defendant Gregory Palmer bringing the "fake" patients to the residence, where they would be seen by Dr. Ebreo or her assistant. Special Agent Graber also occasionally observed defendants Larry Adams or Young at the house, but George Williams was only there infrequently. According to Special Agent Graber, there was no reason for George Williams to be at the residence given how the scheme worked. Special Agent Graber also knew that George Williams had an office elsewhere. Special Agent Graber also stated at the evidentiary hearing that he did not observe any packages coming in or out of the Stratford residence, and that he did not hear any reports regarding any such packages.

On September 25, 2008, Special Agent Graber started surveillance of the Stratford residence, along with other DEA agents, around 2:50 p.m. Special Agent Graber also testified that he took up a position just south of the residence. According to Special Agent Graber, a

Mercedes associated with George Williams, either as the driver or the passenger, was parked in the driveway. The Mercedes left within five or six minutes of the start of the surveillance. Additionally, at approximately 2:58 p.m., Yolando Young left the residence and went to a branch of Comerica Bank. Special Agent Graber did not see her go to the bank after she left, but other agents followed her and relayed him the information.

Special Agent Graber also stated at the evidentiary hearing that, around 3:07 p.m. on September 25, 2008, the DEA agents monitoring the wiretap broadcasted over the radio that there had been a phone call from Young to George Williams in which she inquired if he was waiting on someone.[5] They also told Special Agent Graber over the broadcast that a female would be arriving in a gray vehicle with out-of-state plates. Special Agent Graber then observed a gray Town and Country minivan arrive and pull into the driveway of the Stratford residence.

Special Agent Graber further testified that, while he could not see what happened next, other agents broadcasted that a black female, later identified as defendant Lyons, left the vehicle and got onto the porch. As stated in his testimony, Special Agent Graber did observe the Mercedes associated with George Williams arrive around 3:12 p.m. The Mercedes stopped short of the driveway, and then drove into the driveway. Next, Lyons returned to the minivan and drove it further into the driveway. The Mercedes followed and Special Agent Graber could no

---

[5]The government entered a transcript of that phone call as its Exhibit #1 at the evidentiary hearing.

longer see the vehicles from his vantage point. According to Special Agent Graber, he had no reason to believe he had been seen.[6]

Around 4:14 p.m., Special Agent Graber observed the Mercedes exit the driveway and drive away. The minivan also drove out and Special Agent Graber made the decision to have the minivan (Lyons' vehicle) stopped. According to Special Agent Graber, he determined that he had probable cause to believe that a drug transaction had taken place or was going to take place because the previous traffic stops that had recovered drugs had all involved vehicles with out-of-state plates, no other vehicles with out-of-state registrations had been observed at the Stratford residence to his knowledge, the fact that the vehicles had pulled further into the driveway indicated an intent to conceal, and the circumstances did not appear to be consistent with a patient coming to get a prescription. Special Agent Graber did not believe that Lyons was coming to get a prescription because the fake patients were usually driven by Palmer, Dr. Ebreo was not at the Stratford residence that day, and George Williams was at the location that day and he was not there at the times of fake patient visits.

After deciding that he had probable cause, Special Agent Graber coordinated a stop with the Michigan State Police. Special Agent Graber testified that he had a Michigan State Police radio that day and he spoke with a lieutenant, who put him in touch with the unit that eventually made the stop, Michigan State Police Troopers Marcus Wise and James Grubbs. Special Agent Graber also testified that he gave the officers a brief synopsis of what was happening and what

---

[6]The government entered photographs of the Stratford residence, Lyons' arrival, and the Mercedes' arrival as its Exhibits #2A through 2E at the evidentiary hearing.

the DEA was investigating. Special Agent Graber further testified that he gave very limited, but significant details as to why the DEA believed there would be narcotics in the car. Special Agent Graber also stated that he asked the troopers to develop their own probable cause to stop the vehicle because the DEA did not want to reveal their investigation. According to Special Agent Graber, the Michigan State Police have made drug stops for the DEA in the past and it was not unusual to ask them to make it look like a regular traffic stop rather than a drug stop. Special Agent Graber also noted that the Michigan State Police would have made the stop even if they did not have their own probable cause and that he never discussed their police reports. Special Agent Graber observed the traffic stop from a distance and he later drove to the Michigan State Police post.

The second witness to testify was Michigan State Police Trooper Marcus Wise. According to Trooper Wise, he was on uniform patrol around 4:20 p.m. on September 25, 2008 with Trooper James Grubbs when they received a call to conduct a traffic stop of an individual under investigation by the DEA. They were given a description of the vehicle and told to establish their own probable cause for the stop, so as to not reveal the ongoing investigation. Trooper Wise does not think such a request is unusual.

Trooper Wise was the driver of a marked unit. He located the vehicle identified by the DEA and drove behind it. While behind the vehicle, Trooper Wise observed an air freshener and several bead necklaces hanging from the rearview mirror. The air freshener was a typical air freshener while the beads were glistening and had a crystal appearance. According to Trooper Wise, the air freshener and beads obstructed part of the driver's vision through the windshield

and, consequently, there was probable cause to make the traffic stop.  In Trooper Wise's opinion, anything hanging from the rearview mirror constitutes a vision obstruction.

Trooper Wise testified that he effectuated the traffic stop near Eight Mile Road and Myers.  The vehicle initially pulled into turnaround, but eventually moved to parking lot.  After the vehicle was stopped, Trooper Wise asked for identification, registration and insurance information.  The driver, defendant Lyons, gave him an Alabama identification card and a car rental agreement[7], but she did not have any proof of insurance.  According to Trooper Wise, Lyons ' hands were shaking and she had deep, labored breathing when he first pulled her over.  Trooper Wise reviewed the rental agreement and found that the car was rented on September 24, 2008 in Alabama.  The rental agreement also indicted that Lyons was suppose to be traveling to North Carolina from Alabama.

Trooper Wise testified that he noticed a strong odor of mothballs and that, after he asked Lyons about the smell, she said she liked the smell.  Trooper Wise also asked Lyons if she was carrying any weapons or drugs, and she said no.  According to Trooper Wise, he then asked Lyons for consent to search her vehicle and she said, "go ahead."

Trooper Wise had Lyons exit the vehicle.  Prior to her doing so, she reached for her purse.  Trooper Wise became concerned for his safety and asked to look into Lyons ' purse.  She consented and he looked into her purse, where he observed several bundles of United States currency.  According to Trooper Wise, he asked Lyons how much money she had, but she did

---

[7]The government entered the unsigned rental agreement and defendant's Alabama Nondriver Identification Card as its Exhibit #3 at the evidentiary hearing.  The Identification Card was also entered as part of defendant's Exhibit #1.

not know.  Lyons did say, however, that the currency was hers and that she had earned it "doing hair."  Lyons also said that she had withdrawn the money from bank account and that she had withdrawal receipts.  Trooper Wise looked for the withdrawal receipts in Lyons' wallet at her request, but he only found deposit receipts.  He then asked Lyons about the withdrawal papers, and she said that she left her withdrawal receipts at home.  Trooper Wise further testified that, after he advised Lyons that her statements were inconsistent, she became teary-eyed and changed her story.  Lyons now said that she got the money from male friend, though she did not know his name.

According to Trooper Wise, he found a Michigan driver's license[8] in Lyons ' purse and that, after he ran a search on the license, he discovered that it was suspended.  He then arrested Lyons for driving with a suspended license.  They were still on Eight Mile Road when Lyons was arrested.  According to Trooper Wise, Lyons said she was from Alabama and that, while she provided an Alabama identification card, she did not provide an Alabama driver's license. Trooper Wise does not recall if he checked to see if she had a valid license in Alabama.  The police report subsequently prepared by Trooper Wise does indicate that Lyons presented an Alabama driver's license.[9]  At the evidentiary hearing, Trooper Wise called that statement in the report a mischaracterization.  The rental agreement presented to Trooper Wise, and as an exhibit at the evidentiary hearing, did have a specific reference to an Alabama driver's license number.

---

[8]The Michigan driver's license was entered as part of defendant's Exhibit #1 at the evidentiary hearing.

[9]Defendant did provide an Alabama driver's license as part of defendant's Exhibit #1 at the evidentiary hearing.

Trooper Wise further testified that, after the arrest, Trooper Grubbs searched the vehicle. Trooper Wise did not participate in the search and he does not recall how long the search took, but he did see its results: over $11,000 and thirty-nine bottles of codeine cough syrup. Trooper Grubbs also found a box of mothballs. In Trooper Wise's experience, the odor of mothballs is often used to mask narcotics from dogs. Trooper Wise did testify, however, that he has no knowledge regarding mothballs masking cough syrup in bottles. Trooper Wise also conceded that he does not know if Lyons had asthma or if she used an inhaler.

The third witness to testify was Michigan State Police Trooper James Grubbs. Trooper Grubbs was working with Trooper Wise on September 25, 2008 when they received a request from the DEA to conduct a traffic stop. The request also contained the appropriate identifying information as to which car they were suppose to stop. The request was relayed to them by a sergeant while they were at their post and it was not an unusual request. Trooper Grubbs also testified that they were asked to see if they saw any traffic violations before making the stop.

While he could not recall if he or Trooper Wise observed Lyons' vehicle first, Trooper Grubbs did observe Lyons operating her vehicle with what he considered to be a vision obstruction. Specifically, Trooper Grubbs observed air fresheners and beads hanging from the rearview mirror. According to Trooper Grubbs, anything hanging from a rearview mirror is a traffic violation, irrespective of whether it actually obstructed the driver's vision.

Trooper Grubbs also testified that, after making the traffic stop, he took a position on the passenger side of Lyons' vehicle. Trooper Grubbs further testified that, after Trooper Wise told him that Lyons had consented to a search, he searched the vehicle and located a sum of money in

the center console, a box of moth balls underneath the passenger's seat, and several bottles of cough syrup in the rear storage area. According to Trooper Grubbs, Trooper Wise probably informed him that Lyons had consented to the search during the stop on Eight Mile Road.

As stated by Trooper Grubbs, Lyons was eventually placed in handcuffs because there was probable cause to believe that a crime had occurred based on what they had gathered from the traffic stop and because there was a question with respect to the status of Lyons' driving privileges in Michigan. Trooper Grubbs does concede that the police report contains information concerning a Alabama driver's license, but he does not remember if Lyons produced a license and he defers to Trooper Wise on that issue. Trooper Grubbs also testified that Lyons was released later that night and allowed to drive away, even though the police knew that her Michigan license had been suspended.

### III. Discussion

Lyons moves to suppress evidence obtained and derived from a traffic stop and search conducted on September 25, 2008. Both traffic stops and searches of automobiles are within the scope of the Fourth Amendment, see, *e.g.*, Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and, accordingly, any evidence seized during an illegal traffic stop or search must be suppressed as "fruits of the poisonous tree," Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008). "It is well settled that in seeking the suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying

suppression." United States v. Rodriguez-Suazo, 346 F.3d 637, 643 (6th Cir. 2003) (quoting

United States v. Feldman, 606 F.2d 679 n. 11 (6th Cir. 1979).

Here, in light of the parties' arguments, three separate issues must be discussed: the automobile exception to the warrant requirement of the Fourth Amendment; investigatory stops made pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and traffic stops made on the basis of civil infractions.   As discussed below, this court finds that, while there may be a question regarding a stop for vision obstruction (a civil infraction), the evidence in this case should not be suppressed because, on the basis of the collective knowledge of the law enforcement officers involved, the traffic stop and search were proper pursuant to the automobile exception.  In the alternative, the evidence should not be suppressed because the traffic stop was a lawful Terry stop based on reasonable suspicion of criminal activity and Lyons consented to the subsequent search of her vehicle.

### A. Automobile Exception

"[A] search conducted without a warrant issued upon probable cause is *per se* unreasonable, ... subject only to a few specifically-established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotation marks omitted).  One specific and well-delineated exception is the automobile exception.  "Under this exception, 'in cases where there was probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'"  United States v. Cope, 312 F.3d 757, 775 (6th Cir. 2002) (quoting Maryland v. Dyson, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d

442 (1999) (emphasis omitted).  "The automobile exception is applicable even in nonexigent circumstances, so long as the vehicle is mobile and law enforcement officers have probable cause to believe that it contains incriminating evidence."  Cope, 312 F.3d at 775 (citing Dyson, 527 U.S. at  466-67).  See also United States v. Ross, 456 U.S. 798, 807-09, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (holding that, in accordance with the "automobile exception" to the warrant requirement, an officer's warrantless search of a vehicle does not violate the Fourth Amendment if the officer has probable cause to believe that a vehicle contains contraband.)  "The test for 'probable cause' is simply whether there is a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (internal quotation marks omitted).  "Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion."  United States v. Smith, 510 F.3d 641, 647-648 (6th Cir. 2007) (internal quotation omitted).  The court's determination of whether probable cause existed at the time of the search is a "commonsense, practical questionto be judged from the totality-of-the-circumstances."  Smith, 510 F.3d at 648 (internal quotation omitted).  "In determining whether there was probable cause, the court does not look to events that occurred after the search or to the subjective intent of the officers; rather, the court looks at the 'objective facts known to the officers at the time of the search.'"  Smith, 510 F.3d at 648 (quoting Smith v. Thornburg, 136 F.3d 1070, 1075 (6th Cir. 1998)).

In this case, while acknowledging that Agent Graber did not personally conduct the search of Lyons' vehicle, the government argues his basis for probable cause is still relevant and that the search was still proper pursuant to the automobile exception given the collective

knowledge of the law enforcement personnel in this case. Courts evaluate the collective

information of all the officers involved in determining whether their actions are proper, whether

that action be an arrest, a search, or a <u>Terry</u> stop. <u>See</u>, *e.g.*, <u>United States v. Hensley</u>, 469 U.S.

221, 232, 105 S.Ct. 675, 682 (1985) (concluding that, if a flyer or bulletin has been issued on the

basis of articulable facts supporting a reasonable suspicion that the wanted person has committed

an offense, then reliance on that flyer or bulletin justifies a <u>Terry</u> stop); <u>United States v. Braggs</u>,

23 F.3d 1047, 1049 (6th Cir. 1994) ("Reasonable suspicion can be based upon police officers'

own observations or upon the collective knowledge of other officers."); <u>United States v. Perkins</u>,

994 F.2d 1184, 1187 (6th Cir. 1993) (upholding a search because "[c]ollectively, the officers in

this case had ample probable cause to stop and search the vehicle being driven by [the

defendant]."); <u>United States v. Hensley</u>, 713 F.2d 220, 223 (6th Cir. 1983), rev'd on other

grounds, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) ((collecting cases and recognizing

the general rule that "probable cause for arrest may emanate from collective police knowledge);

<u>United States v. Fofo</u>, 39 Fed. Appx. 180, 183 (6th Cir. 2002) ((permitting a search pursuant to

the automobile exception where there was no question that the collective knowledge of law

enforcement personnel cooperating on the case gave them probable cause to believe that heroin

was being transported in the rental car); <u>United States v. Valencia</u>, 913 F.2d 378 (7th Cir.1990)

(state officers' arrest of suspect based on DEA agent's probable cause suffices for fourth

amendment inquiry). Moreover, in determining whether actions are proper, courts must evaluate

the collective information of all the officers involved, including cooperating federal and local

authorities. <u>Feathers v. Aey</u>, 319 F.3d 843 (6th Cir. 2003); <u>Srisavath v. City of Brentwood</u>, 243

Fed. Appx. 909 (6th Cir. 2007); <u>Cansler v. City of Henderson</u>, No. 4:06-CV-89-M, 2008 WL 4500041, \*5 (W.D. Ky. October 2, 2008) (McKinley, J.).

In particular, where one law enforcement officer is directed to do something by another, the court must look at the first officer's knowledge in determining whether the second officer's actions were proper. <u>See</u>, *e.g.*, <u>Hensley</u>, 469 U.S. 221; <u>Whiteley v. Warden</u>, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). In <u>Hensley</u>, a police officer conducted a traffic stop of the defendant's vehicle pursuant to a flyer, issued by another police department, stating that Hensley was wanted for investigation of an aggravated robbery. <u>Hensley</u>, 469 U.S. at 223. The United States Supreme Court subsequently held that, when a <u>Terry</u> stop is made in reliance on a flyer, the propriety of the stop turns on whether the officers who issued the flyer possessed a reasonable suspicion to make the stop and not on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance. <u>Hensley</u>, 469 U.S. at 229-233. Similarly, in <u>Whiteley</u>, a county sheriff in Wyoming obtained an arrest warrant for a person suspected of burglary and issued a message through a statewide law enforcement radio network describing the suspect, his car, and the property taken. At least one version of the message also indicated that a warrant had been issued. <u>Whiteley</u>, 401 U.S. at 564 and n. 5. The message did not specify the evidence that gave the sheriff probable cause to believe the suspect had committed the breaking and entering. <u>Whiteley</u>, 401 U.S. at 562-564. In reliance on the radio message, police in Laramie stopped the suspect and searched his car. <u>Whiteley</u>, 401 U.S. at 563. The United States Supreme Court ultimately concluded that the

sheriff had lacked probable cause to obtain the warrant and that the evidence obtained during the

search by the police in Laramie had to be excluded.  In so ruling, however, the Court noted:

> We do not, of course, question that the Laramie police were
> entitled to act on the strength of the radio bulletin.  Certainly
> police officers called upon to aid other officers in executing arrest
> warrants are entitled to assume that the officers requesting aid
> offered the magistrate the information requisite to support an
> independent judicial assessment of probable cause.  Where,
> however, the contrary turns out to be true, an otherwise illegal
> arrest cannot be insulated from challenge by the decision of the
> instigating officer to rely on fellow officers to make the arrest.

[Whiteley, 401 U.S. at 568.]  Thus, "had the sheriff who issued the radio bulletin possessed

probable cause for arrest, then the Laramie police could have properly arrested the defendant

even though they were unaware of the specific facts that established probable cause."  Hensley,

469 U.S. at 230-231 (describing the holding in Whiteley).

　　The reasons for examining the collective knowledge of law enforcement officers when

one officer directs another to do something is clear.  As stated by the Supreme Court:

> In an era when criminal suspects are increasingly mobile and
> increasingly likely to flee across jurisdictional boundaries, this rule
> is a matter of common sense: it minimizes the volume of
> information concerning suspects that must be transmitted to other
> jurisdictions and enables police in one jurisdiction to act promptly
> in reliance on information from another jurisdiction.

[Hensley, 469 U.S. at 231.]  Stated another way, "effective law enforcement cannot be conducted

unless police officers can act on directions and information transmitted by one officer to another

and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow

officers about the foundation for the transmitted information." Humphrey v. Mabry, 482 F.3d 840, 848-849 (6th Cir. 2007) (quoting Hensley, 469 U.S. at 231).

While law enforcement personnel need not provide one another with specific facts justifying an action when directing or asking for an action to be done, what is said does matter and it is the objective reading of a message that determines whether other law enforcement officers can defensibly act in reliance on it and what actions they can take. See, e.g., Hensley 469 U.S. at 233 ("It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it."). For example, in Hensley, the flyer twice stated that Hensley was wanted for investigation of an aggravated robbery, described both Hensley and the date and location of the alleged robbery, and asked other departments to pick up and hold Hensley for the St. Bernard police in the event he were located. Hensley, 469 U.S. at 223. The flyer also warned other departments to use caution and to consider Hensley armed and dangerous. Hensley, 469 U.S. at 223. Examining the flyer issued by the St. Bernard police, the Supreme Court determined that an objective reading of the entire flyer would lead an experienced officer to conclude that Hensley was at least wanted for questioning and investigation in St. Bernard, and that another officer could therefore rely on the flyer and conduct a brief Terry stop to check Hensley's identification, pose questions, and inform the suspect that the St. Bernard police wished to question him. Hensley, 469 U.S. at 234. An experienced officer could also assume that a warrant might have been obtained in the period after the flyer was issued and, accordingly, the flyer would further justify a brief detention at the scene of the stop while officers checked whether a warrant had in fact been issued. Hensley, 469

U.S. at 234.  As stated by the Supreme Court, "what matters is that the stop and detention that occurred were in fact no more intrusive than would have been permitted an experienced officer on an objective reading of the flyer."  Hensley, 469 U.S. at 234-235.  In particular, the Supreme Court noted that, while the flyer asked other departments to pick up and hold Hensley for St. Bernard instead of requesting that other police departments briefly detain Hensley merely to check his identification or confirm the existence of a warrant, an objective reading of the flyer might not justify such a detention, whether at the scene or at the Covington police headquarters, given the distance involved and the time required to identify and communicate with the department that issued the flyer.  Hensley, 469 U.S. at 235.  According to the Supreme Court, "such a detention might well be so lengthy or intrusive as to exceed the permissible limits of a Terry stop."  Hensley, 469 U.S. at 235 (citation omitted).  However, because such a situation did not occur, the Supreme Court only held that the "flyer, objectively read and supported by a reasonable suspicion on the part of the issuing department, justified the length and intrusiveness of the stop and detention that actually occurred."  Hensley, 469 U.S. at 235.

In Blair, a police officer, Officer Munday, was working in an undercover capacity and observed an individual later identified as the defendant, Marcus Blair, engage in a hand to hand transaction outside of a house and then drive away.  Blair, 524 F.3d at 744.  Officer Munday believed the transaction to be drug related, but decided he lacked probable cause for an arrest because he could not determine what items had been exchanged.  Blair, 524 F.3d at 744-745.  Officer Munday radioed another officer, Officer Holmes, of the possible drug transaction but did not instruct Officer Holmes to pull Blair over.  Blair, 524 F.3d at 745.  Nonetheless, when

Officer Holmes saw Blair's car approach from the direction of the suspect house, Officer Holmes pulled over Blair's vehicle upon suspicion that the "tag-light," or license plate light, was burned out. The officer also noticed that Blair was "'a little fidgety' and was reaching underneath the seats of his vehicle." Blair, 524 F.3d at 745. The officer informed Blair that he had been pulled over for a tag-light violation, obtained Blair's license, and ran a check revealing that Blair's license was valid and that he had no outstanding warrants. Blair, 524 F.3d at 745. Officer Munday, having heard Blair's name over the radio, informed Officer Holmes that during a previous encounter Blair had been armed and had attempted to flee. Blair, 524 F.3d at 745. Officer Holmes then asked Blair for permission to search his car. Blair, 524 F.3d at 746. Blair refused, and Officer Holmes continued to press, telling Blair that he was not under arrest, but that the area was known for drugs and he had reason to believe Blair possessed narcotics. Blair, 524 F.3d at 746. Officer Munday then arrived and identified Blair's vehicle as the one Officer Munday had observed. Blair, 524 F.3d at 746. Upon Blair's continued refusal to consent to a search, Officer Holmes called in a canine unit. After the canine unit arrived, Officer Holmes ordered Blair to exit the vehicle and observed Blair reach underneath the seats and toward his ankle area as he was exiting the vehicle. Blair, 524 F.3d at 746. Officer Holmes told Blair to stop reaching, searched him, and found several bags of crack cocaine. Blair, 524 F.3d at 746.

With respect to the collective knowledge of the officers involved in Blair, the Sixth Circuit held:

The government contends that the hand-to-hand transaction could justify a Terry stop based on the collective knowledge of Officers Munday and Holmes. We reject this argument. The government cites United States v. Barnes, 910 F.2d 1342, 1344 (6th Cir. 1990), for the unremarkable proposition that one officer may conduct a Terry stop based on information obtained from another officer. According to Officer Holmes's own testimony, however, he did not obtain information regarding the hand-to-hand transaction until after the stop occurred. The government's reliance on United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), is similarly misplaced, as the case is readily distinguishable. In Hensley, the Court upheld a Terry stop by one police department premised on a "wanted" flyer issued by another department. The flyer contained information that the defendant was wanted for investigation of an aggravated robbery. Id. at 223, 105 S.Ct. 675. The Court concluded that because the department that issued the flyer had reasonable, articulable facts that would justify a Terry stop, the other department could rely on the flyer. Id. at 235., 105 S.Ct. 675. In the case at hand, however, Officer Munday never communicated why Blair should be stopped, or even that he should be stopped at all. According to Officer Holmes, the only information he received prior to the stop was that a car was leaving the suspect house. As a result, Hensley does not apply.

[Blair, 524 F.3d at 751 -752.]

In this case, Special Agent Graber testified that he spoke directly with Troopers Grubbs and Wise and that he gave them a brief synopsis of what was happening and what the DEA was investigating. Special Agent Graber also testified that he gave very limited, but significant details to the troopers as to why the DEA believed there would be narcotics in the car. Special Agent Graber further stated that he asked the troopers to develop their own probable cause to stop the vehicle because the DEA did not want to reveal their investigation. Moreover, while Trooper Grubbs testified that the request to stop the vehicle was relayed to them by a sergeant

while they were at their post, Trooper Wise's testimony confirms that they received a call from the DEA and what the DEA asked them to do.

Viewing the information communicated to the troopers objectively, they could defensibly act in reliance on that communication when stopping and searching Lyons' vehicle. Special Agent Graber did not tell them everything, but he did tell them to stop the vehicle and that he had probable cause to believe that narcotics were in the car. Defendant appears to argue that the troopers could not defensibly rely on the communication from the DEA in justifying the stop and that the collective knowledge doctrine does not apply because the troopers were asked to find independent reasons to make the traffic stop. In particular, defendant notes that the police report relating to this case omits any mention of the DEA's request and that it merely states that Lyons was stopped for driving with a vision obstruction. However, Special Agent Graber testified that the Michigan State Police were to stop and search the vehicle even if they did not have independent reasons for stopping the vehicle and, in any event, the fact that the law enforcement officers concocted a ruse does not invalidate the probable cause justifying the search pursuant to the automobile exception. See, *e.g.*, U.S. v. Rosario, 305 Fed. Appx. 882, 884 (3d. Cir. 2009) (upholding a search on the basis of the DEA's knowledge and without examining the purported state law reasons for the traffic stop where the DEA requested that the police search a vehicle, the police officer conducted a traffic stop, and the police report contained deliberate falsehoods in order to protect the confidentiality of the ongoing DEA investigation); U.S. v. Christopher, No. 03-CR-124-C, 2004 WL 63955, *3 (W.D. Wis. Jan. 5, 2004) (Crabb, J.) (holding that a

search was constitutional even though the traffic stop at issue was never more than a cover story developed to protect a covert investigation).

Given that the troopers could defensibly act in reliance on the communication and direction of the DEA when stopping and searching Lyons' vehicle, the court must look at Special Agent Graber's knowledge in determining whether the troopers' actions were proper. See, e.g., Hensley, 469 U.S. 221; Whiteley, 401 U.S. at 568. As discussed above, based on the totality of the circumstances, Special Agent Graber had probable cause to believe that Lyons' vehicle contained contraband or incriminating evidence. Based on the DEA investigation and, in particular, the wiretap of Young's phone, Special Agent Graber knew that George Williams and his associates were obtaining and distributing prescription drugs. Special Agent Graber also knew that the 20226 Stratford address was a location used by George Williams and his associates in furtherance of their scheme. Typically, the Stratford residence was the place where fake patients would be examined by Dr. Ebreo, but Special Agent Graber had good reasons for believing that Lyons was there to pick up drugs rather than a prescription on September 25, 2008: Lyons was driving a vehicle with Alabama plates and the previous traffic stops that recovered drugs had all involved vehicles with out-of-state plates; to Special Agent Graber's knowledge, no other vehicles with out-of-state registration had been observed at the Stratford residence for a fake patient visit; the fake patients were usually driven by Palmer; Dr. Ebreo was not there that day to prescribe any drugs; George Williams was there and he was not present for fake patient visits. Additionally, Special Agent Graber knew that prescription drugs were more valuable in southern states and that George Williams was expecting Lyons' visit from Alabama.

Moreover, the vehicles eventually moved from the front of the driveway to a position in the driveway where they could not be seen from the street, which suggests an intent to conceal what they were doing. Lyons argues in her briefs that Special Agent Graber's probable cause was pure speculation, especially in light of the fact that no packages were observed and the previous traffic stops were not connected to the Stratford residence, but this court finds that, based on the totality of the circumstances discussed above, probable cause clearly existed to believe that Lyons' vehicle contained contraband or incriminating evidence.

Therefore, based on the collective knowledge of the officers involved, the stop and search of Lyons' vehicle was proper pursuant to the automobile exception to the Fourth Amendment's warrant requirement. Accordingly, defendant Lyons' motion to suppress should be denied.

### B. *Terry* Stop

In the alternative, even if the stop and search were not proper pursuant to the automobile exception, Lyons' motion should still be denied because the stop was a lawful Terry stop and the search was made with Lyons' consent. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), governs traffic stops made on the basis of suspected criminal activity. Pursuant to Terry, a warrantless encounter may be countenanced under the Fourth Amendment if an officer has reasonable suspicion that criminal activity may be afoot. United States v. Campbell, 549 F.3d 364, 370 -371 (6th Cir. 2008). Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a

particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a <u>Terry</u> stop." <u>Dorsey v. Barber</u>, 517 F.3d 389, 395 (6th Cir. 2008) (quoting <u>Smoak v. Hall</u>, 460 F.3d 768, 778-79 (6th Cir. 2006)). A <u>Terry</u> stop must be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was appropriate." <u>Terry</u>, 392 U.S. at 21-22 (citations omitted). In other words, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing <u>Terry</u>, 392 U.S. at 27, 88 S.Ct. 1868). A court considers the totality of the circumstances to determine the validity of a Terry stop. <u>Blair</u>, 524 F.3d at 750. During a <u>Terry</u> stop, the officer may conduct a brief traffic stop for investigative purposes and make reasonable inquiries to confirm or dispel his suspicions. <u>United States v. Butler</u>, 223 F.3d 368, 374 (6th Cir. 2000).

As discussed above, the reasonable suspicion for a <u>Terry</u> stop can be based on the collective knowledge of law enforcement officers. <u>See</u>, *e.g.*, <u>Braggs</u>, 23 F.3d at 1049. Moreover, where one law enforcement officer is directed to do something by another, the court must look at the first officer's knowledge in determining whether the second officer's actions were proper, so long as the second officer can defensibly act in reliance on the communication in taking whatever actions he takes. <u>Hensley</u>, 469 U.S. 221, 233.

Here, Troopers Grubbs and Wise could defensibly act in reliance on the direction and information given to them by Special Agent Graber in making a <u>Terry</u> stop. Special Agent Graber requested that the troopers stop Lyons' vehicle and he gave them a brief synopsis of what

was happening, how the DEA was investigating, and the significant details as to why the DEA believed there would be narcotics in the car. Morever, given that the troopers could rely on Special Agent Graber's communications and request in making a <u>Terry</u> stop, the court must look at Special Agent Graber's knowledge in determining whether the <u>Terry</u> stop was proper. Here, as discussed above, Special Agent Graber's knowledge gave him probable cause to believe that contraband was in Lyons' vehicle and, consequently, his knowledge clearly meets the lesser reasonable suspicion standard for a <u>Terry</u> stop.

The government also argues that, after the troopers made a lawful stop of Lyons' vehicle, Lyons consented to a search of that vehicle. The validity of a consent to search is a question of fact, to be proved by the government and determined by the "totality of all the circumstances." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); <u>see also</u> <u>United States v. Crowder</u>, 62 F.3d 782, 786-87 (6th Cir. 1995). Relevant circumstances include "the youth of the accused, his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep," <u>Schneckloth</u>, 412 U.S. at 226 (internal citations omitted), as well as the defendant's "knowledge of the right to refuse consent," <u>Schneckloth</u>, 412 U.S. at 227.

Here, Trooper Wise testified that he asked Lyons for consent to search her vehicle and she said, "go ahead." According to Trooper Wise, this request happened prior to Lyons exited her vehicle. Trooper Grubbs testified that Trooper Wise told him that Lyons had consented to a search, but he did not hear the request or response. Trooper Grubbs also testified that Trooper

Wise probably informed him that Lyons had consented to the search during the stop on Eight Mile Road. Defendant did not produce any evidence rebutting that testimony. She does suggest in her supplemental brief that her consent is in question because she was placed in handcuffs prior to the request for the search, but there no support for that argument in the evidence. This court finds Trooper Wise to be credible on the question of consent and that the search was proper.

Therefore, even if the stop and search were not proper pursuant to the automobile exception, the stop was a lawful Terry stop based on the collective knowledge of the officers involved and the search was made with defendant Lyons' consent.

## C. Civil Infraction

A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. Blair, 524 F.3d at 748 (citations omitted). Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). Put another way, "[t]he requirements of probable cause are satisfied 'where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.'" United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005) (internal quotations omitted). When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant, Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and "police officers [may]

stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).

Here, the troopers testified that they observed a vision obstruction in violation of M.C.L. § 257.709. M.C.L. § 257.709 provides in the pertinent part:

> (1) A person shall not drive a motor vehicle with any of the following:
>
> (a) A sign, poster, nontransparent material, window application, reflective film, or nonreflective film upon or in the front windshield, the side windows immediately adjacent to the driver or front passenger, or the sidewings adjacent to and forward of the driver or front passenger.
>
> (b) A rear window or side window to the rear of the driver composed of, covered by, or treated with a material that creates a total solar reflectance of 35% or more in the visible light range, including a silver or gold reflective film.
>
> (c) A dangling ornament or other suspended object that obstructs the vision of the driver of the vehicle, except as authorized by law.
>
> * * *
>
> (3) This section shall not apply to:
>
> * * *
>
> (d) A vehicle registered in another state, territory, commonwealth of the United States, or another country or province.

Therefore, regardless of whether Lyons had an object dangling from her rearview mirror that may have violated restrictions placed on Michigan vehicles, her vehicle was not subject to the restriction because the vehicle it registered in another state. M.C.L. § 257.709(3)(d). The

officers in this case testified that they knew, based on the description given them and their own observations, that Lyons' car had an out-of-state plate and they do not assert that Lyons violated any other traffic laws. Based on the officer's knowledge of the out-of-state plates on the vehicle and the fact that such vehicles are exempt from violation of the statute, the officers would not have reason to believe that Lyons' vehicle was in violation of M.C.L. § 257.709 and they lacked probable cause to believe that a traffic violation had occurred. Therefore, whether or not the search was properly made pursuant to the automobile exception or a <u>Terry</u> stop, a civil infraction cannot be the basis of the stop.[10]

## IV.  Conclusion

For the reasons discussed above, this court recommends that defendant Lyons' motion be **DENIED** and that the evidence obtained or derived from the September 25, 2008 traffic stop not be suppressed. On the basis of the collective knowledge of the law enforcement officers involved, the stop and search were proper pursuant to the automobile exception to the Fourth Amendment's warrant requirement. In the alternative, the traffic stop was a lawful <u>Terry</u> stop based on reasonable suspicion of criminal activity and Lyons consented to the subsequent search of her vehicle.

---

[10]This court would also note that, even if the statute did apply to Lyons' out-of-state vehicle, the troopers may still have lacked probable cause to believe a traffic violation had occurred. Neither trooper testified how or why the air freshener or beads actually obstructed Lyons' vision. Instead, the police officers merely testified that anything hanging from the rearview mirror is a *per se* traffic violation, which is a mischaracterization of the statute at issue here. <u>See</u> <u>People v. Fisher</u>, 463 Mich. 881, 617 N.W.2d 37, 37 (Mich. 2000) (Corrigan, J,, concurring). However, that testimony is irrelevant given the basis for upholding the stop.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508 (6th Cir. 1991); <u>United States v. Walters</u>, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991); <u>Smith v. Detroit Fed'n of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

<u>S/Virginia M. Morgan</u>
Virginia M. Morgan
United States Magistrate Judge

Dated: February 22, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on February 22, 2010.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan