UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,                CRIMINAL NO. 09-20224

    v.                         DISTRICT JUDGE VICTORIA A. ROBERTS

NEIL CHAPPLE (D-7),           MAGISTRATE JUDGE VIRGINIA M. MORGAN

        Defendant.[1]
_____/

### REPORT AND RECOMMENDATION
### TO DENY DEFENDANT NEIL CHAPPLE'S
### MOTION TO SUPPRESS (D/E #122)

## I. Introduction

       This matter comes before the court on defendant Neil Chapple's "Motion to Suppress -

October 27, 2008" (D/E #122).[2]  Defendant seeks to suppress evidence arising out of a traffic

stop of defendant by Detroit Police officers on October 27, 2008.  The government filed a

---

     [1]Defendant Neil Chapple was indicted along with ten co-defendants: George Williams, Brandon Williams, Nancy Williams, Yolando Young, Ernest Larry Adams, Webb Smith, Gregory Palmer, Nathaniel Darryl Williams, Anthony Richardson, and Katrina Lyons.

     [2]Co-defendant Adams (D/E #132) joined in Chapple's motion.  However, while Adams makes similar arguments as Chapple in his own motion to suppress, with respect to a different traffic stop (D/E #131), he does not demonstrate any standing to assert a Fourth Amendment violation here by identifying an expectation of privacy in Chapple's vehicle or the evidence seized.  See, e.g., United States v. Waller, 426 F.3d 838, 843-844 (6th Cir. 2005) (stating that, because Fourth Amendment rights are "personal," a defendant at a suppression hearing must show a legitimate expectation of privacy in the place searched or the thing seized) (internal quotation omitted).

response in opposition to the motion (D/E #136) and this court heard oral arguments and conducted an evidentiary hearing with respect to the motion on January 12, 2010 and January 15, 2010. For the reasons discussed below, the court recommends that defendant Chapple's motion to suppress be **DENIED** and that the evidence obtained or derived from the October 27, 2008 traffic stop not be suppressed.

## II. Background

### A. Indictment

In this case, defendant Chapple and his ten co-defendants are charged together in an Indictment (D/E #4). In the "General Allegations" section of the indictment, the government alleges that the named defendants and others engaged in a scheme and pattern of illegal conduct involving prescription drug controlled substances and fraudulent health care billings. (Indictment, p. 1) The Indictment alleges that George Williams organized and operated a purported health care business under the name Quick Response Medical Professionals, P.C. ("QRMP"). (Indictment, pp. 1-2) Brandon Williams and Nancy Williams assisted in the creation and operation of QRMP. (Indictment, p. 3) Brandon Williams and Nancy Williams are also alleged to have caused fraudulent Medicare billings in connection with QRMP. (Indictment, p. 3)

According to the Indictment, George Williams recruited fake patients to see doctors employed by QRMP, with QRMP employee Yolanda Young scheduling the visits and instructing the patients to ask for particular controlled substance prescriptions with a high street value. (Indictment, p. 2) Other employees of QRMP included Gregory Palmer and Darryl

Williams, who transported most of the patients, and Anthony Richardson, who worked as a security guard protecting the cash and keeping order. (Indictment, p. 2)

The patients were paid up to $220 for their time and use of their Medicare card, but they did not retain the prescriptions. (Indictment, p. 2) The prescriptions were retained by George Williams, who had them filled at various cooperating pharmacies. (Indictment, p. 2) The controlled substances were then picked up by George Williams, Webb Smith, and/or Ernest Larry Adams. (Indictment, p. 2) Employees such as Smith or Adams were then directed to deliver the controlled substances to distributers in exchange for money. (Indictment, p. 2) One of the alleged distributers was Katrina Lyons. (Indictment, pp. 2-3)

In the specific counts of the indictment, Chapple is charged in Count One ("21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances"); Count Four ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances -Oxycodone"); Count Eight ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances -Oxycodone")[3]; and Count Eighteen ("Forfeiture Allegations (18 U.S.C. 981(a)(1)(C), and 28 U.S.C. 2461(c); 21 U.S.C. § 853)"). With respect to the specific possession with intent to distribute charges, Count Four is only against Chapple and it relates to a July 3, 2008 while Count Eight is against both Chapple and Adams and it relates to an October 27, 2008 incident.

### B. Motion to Suppress

---

[3]According to the government, due to a clerical error, the Indictment refers to Oxycontin in Count Eight when the drug actually seized was Vicodin. The government also asserts that the error will be corrected before trial by either a stipulation or a superseding indictment.

On November 23, 2009, defendant filed the motion to suppress pending before the court (D/E #122). In that motion, defendant argues that the initial traffic stop was improper, the pills seized were not in plain view, it was not readily apparent that the pills seized were contraband or intrinsically incriminating, and that the car was searched without probable cause.

On January 4, 2010, the government filed a response to defendant's motion to suppress (D/E #136); arguing that the collective knowledge of the DEA and the Detroit Police provided probable cause to search defendant's vehicle pursuant to the automobile exception to the warrant requirement of the Fourth Amendment. The government also argues that, as an alternative ground, the violation of a traffic law justified the stop of the vehicle and that the pills were in plain view.

On January 22, 2010, defendant filed a supplemental brief in support of his motion to suppress (D/E #152). In that motion, defendant argues that the search and seizure cannot be justified as a traffic stop followed by a plain view seizure. Defendant also argues that the search and seizure cannot be justified as a probable cause seizure under the collective knowledge doctrine.

On February 2, 2010, the government filed a supplemental brief in support of its opposition to defendant's motion (D/E #164). In that supplemental brief, the government argues that the officers made a valid traffic stop followed by a plain view seizure of the drugs. The government also argues that a "radio run" supported by probable cause known to the requesting officer allows a patrol officer to stop the requested vehicle.

## C. Evidentiary Hearing

Four witnesses testified at the evidentiary hearing. The first witness to testify at the evidentiary hearing was Sergeant Larry Meinke of the Detroit Police Department's Eastern District Narcotics Enforcement Crew. Sgt. Meinke testified that, on October 27, 2008, he was working for the "Halloween Task Force" and looking at abandoned homes with Officer Robert Gadwell. Sgt. Meinke and Officer Gadwell were in a "raid van" and Sgt. Meinke was driving. The raid van is a semi-marked police vehicle.

Sgt. Meinke also testified that at approximately 7:15 p.m. on October 27, 2008, they received a message from dispatch that the Drug Enforcement Administration (DEA) was looking for someone to stop a vehicle. At the evidentiary hearing, Sgt. Meinke could not recall if the DEA just wanted the vehicle or the driver identified. The request also provided a location and description of the vehicle. The vehicle in question was a gray Ford Expedition. Since the call came in from the DEA, Sgt. Meinke took for granted that the request had something to do with narcotics.

Sgt. Meinke further testified that they headed toward the intersection provided by dispatch. It was already dark outside and his headlights were on. He was heading eastbound down Flanders when a vehicle backed out of a driveway and Sgt. Meinke had to slam on the brakes. According to Sgt. Meinke, the vehicle that pulled out of the driveway was the Ford Expedition they were looking for and that the driver of that Expedition, later identified as defendant Chapple, had committed a civil infraction by pulling out of the driveway and almost hitting the raid van.

After identifying the vehicle, Sgt. Meinke activated the oscillating light on the raid van and defendant pulled over to the curb. Sgt. Meinke parked behind the Expedition, exited the raid van, and walked up to the driver's door of the Expedition. Sgt. Meinke also testified that Officer Gadwell exited the raid van and went to the passenger's side of the defendant's vehicle. Sgt. Menneke spoke with defendant, asked defendant for his driver's license, and explained why he pulled defendant over. Sgt. Meinke also testified that, while he was speaking to defendant, he could see that Officer Gadwell through passenger window and that the dome light was on in the vehicle. According to Sgt. Meinke, Officer Gadwell was motioning to him and giving him a facial expression that Sgt. Meinke knew, through his experience working with Officer Gadwell, meant that Officer Gadwell had seen something and that Sgt. Meinke should have defendant exit the vehicle. Sgt. Meinke then asked defendant to exit the vehicle and he took defendant to the rear of the vehicle.

Office Gadwell advised Sgt. Meinke that defendant had two vials of Vicodin pills on the front passenger seat. Sgt. Meinke did not see the pills given his vantage point and the size of defendant. The police asked defendant about the pills and defendant said he was taking the Vicodin himself because of a car accident. However, according to Sgt. Meinke, Officer Gadwell showed him the containers and they contained one thousand pills, which is more than someone could get with a prescription, as Vicodin is a controlled substance and a Schedule One narcotic. Sgt. Meinke testified that the vials were like the ones at a pharmacy, large approximately six inches high, eight inches high, and about four or five inches round. Each bottle contained five hundred Vicodin pills. On the basis of the vials of pills Sgt. Meinke decided to arrest defendant.

According to Sgt. Meinke, he subsequently spoke with the DEA agent who had wanted the car stopped, Christopher Dziedzic, and learned that defendant was being watched as a part of an ongoing, large scale investigation. Special Agent Dziedzic asked to take the pills and Sgt. Meinke gave them to him. The agent also advised him that the DEA would incorporate defendant's arrest into their case. Sgt. Meinke further testified that the police report Officer Gadwell prepared, and that Sgt. Meinke reviewed, made no mention of the DEA or its request.

The second witness to testify at the evidentiary hearing was Officer Robert Gadwell of the Detroit Police Department. Officer Gadwell testified that, on the night of October 27, 2008, he was working with Sgt. Meinke and doing some street enforcement action in the east side of Detroit. Officer Gadwell also testified that, at some point they received some vague information over the radio about a unit looking to stop a vehicle. He did not know who made the request, but it contained a vehicle description and an approximate area. The vehicle was in the area that he and Sgt, Meinke were in, so they headed toward the area identified by dispatch.

According to Officer Gadwell, as they were heading eastbound on Flanders, a vehicle backed out in front of them and Sgt. Meinke had to slam on the brakes. They then stopped the vehicle and approached it. Officer Gadwell testified that he approached the passenger's side while Sgt Meinke went to the driver's side. Officer Gadwell also testified that the interior lights of the vehicle were on and that he illuminated the inside of his vehicle with his flashlight as well. Officer Gadwell testified that he could see two large bottles of pills on the front passenger seat. Officer Gadwell also stated at the evidentiary hearing that he could see on a Hydrocodone label on one of the bottles and, that in his experience working in narcotics, Hydrocodone is strictly

regulated. Officer Gadwell further stated that bottles of the size in defendant's vehicle, and with that many pills, are never given out as prescriptions. He also knows that bottles of that size are commonly stolen from pharmacies and that the pills are sold illegally.

Officer Gadwell testified that he signaled to Sgt Meinke to ask the driver to exit the vehicle and that, once defendant left, Officer Gadwell confiscated the pills. The pills were in larger size bottles, like the ones that come from manufacturers, and there were no prescriptions on them. Officer Gadwell subsequently searched the whole vehicle and he found a brown paper bag on the floor of the front passenger side. The bag was folded up.

The third witness to testify at the evidentiary hearing was Special Agent Christopher Dziedzic of the DEA. Special Agent Dziedzic testified that initiated the case against defendants and that he was the lead case agent. He initiated the case in June of 2007 after a traffic stop in Ohio of a vehicle with a Kentucky license plate that contained, approximately sixty bottles of cough syrup. Special Agent Dziedzic also testified that the DEA then conducted interviews and surveillance, and that, by October 27, 2008, there were wire taps on two telephones used by George Williams. According to Special Agent Dziedzic, the DEA had determined through its investigation that George William was the lead person in an organization engaged in a scheme of illegal conduct involving prescription drug controlled substances and fraudulent health care billings. As learned by Special Agent Dziedzic, George Williams and his associates recruited fake patients to see doctors employed by them, with Yolando Young scheduling the visits and instructing the patients to ask for particular controlled substance prescriptions. The patients were paid up to $220 for their time and use of their Medicare card, but they did not retain the

prescriptions.  Instead, George Williams and his associates, including Ernest Larry Adams, had them filled at various cooperating pharmacies.  Employees such as Adams were then directed to deliver the controlled substances to distributers in exchange for money.

Prior to October 27, 2008, Special Agent Dziedzic had exploited the information gained from the wiretaps and made a number of seizures from the organization. For example, on September 25, 2008, Katrina Lyons was stopped on the basis of information gained from the wiretap and prescription drugs were recovered.  Similarly, on October 16, 2008, the DEA received information from the wiretap and established surveillance on a pharmacy.  Eventually, the DEA, observed Adams leaving the pharmacy and they subsequently initiated a traffic stop Adams' vehicle.  According to Special Agent Dziedzic, three hundred Oxycontin pills were recovered.  Furthermore on October 24, 2008, the DEA established surveillance at another pharmacy, on the basis of information discovered through the wiretap, and observed George Williams, along with Webb Smith, carrying large cardboard boxes out of the pharmacy.  The DEA then followed George Williams to the Miller Arms Apartments, which contained a location known as the "bat cave", and watched George William and Smith unload the boxes.  Sometime later, the DEA observed the boxes being placed back into a vehicle.  Special Agent Dziedzic also testified that the DEA then coordinated a traffic stop of the vehicle with the Michigan State Police and recovered approximately seven hundred Oxycontin pills. According to Special Agent Dziedzic, quite a number of different controlled substances were also recovered.

Special Agent Dziedzic testified that, on October 27, 2008, there were five phone calls on the tapped phones involving Chapple.[4]  However, Special Agent Dziedzic did not review the first two phone calls or rely on them in making the traffic stop at issue here.  The wiretaps were on George Williams' cell phones so there was no way for Special Agent Dziedzic to know where George Williams was during the conversations.

Special Agent Dziedzic also testified that, on October 27, 2008, he and his partner were driving when they received a phone call from the investigator monitoring the wiretap. According to that investigator, on the basis of an intercepted conversation, it appeared that George Williams was waiting for someone and that a deal was going to take place.  The conversation was between George Williams and defendant.[5]

Around 6:31 p.m., the monitoring agent relayed information relating to a second phone call between George Williams and Chapple.[6]  During that conversation, statements were made that George Williams and defendant would meet at a McDonald's soon.  On the basis of that information, Special Agent Dziedzic and his partner drove to the bat cave, which Special Agent Dziedzic had previously observed drugs being taken in and out of, and established surveillance. As part of surveillance,  Special Agent Dziedzic observed Adams' vehicle nearby.

---

[4]The transcripts were entered by the government as its Exhibits #1 through #5 at the evidentiary hearing.

[5]The transcripts of that phone call was entered by the government as its Exhibit #3 at the evidentiary hearing.

[6]The transcripts of that phone call was entered by the government as its Exhibit #4 at the evidentiary hearing.

Special Agent Dziedzic further testified that, at 6:41 p.m. on October 27, 2008, he observed Adams exit that bat cave and enter his vehicle. Special Agent Dziedzic decided to follow Adams. He then followed Adams to a McDonald's about three quarters of a mile from the bat cave. According to Special Agent Dziedzic, he and his partner parked in a spot facing Adams' vehicle and there was already a Ford Expedition parked next to Adams' vehicle when they arrived. Special Agent Dziedzic then observed Adams exit his vehicle while carrying a bag. Special Agent Dziedzic could not see inside or through the bag Adams was carrying. Adams entered the Expedition. Special Agent Dziedzic went into the McDonald's for a minute and, when he returned, he observed Adams exit the Expedition. Adams then drove away, but Special Agent Dziedzic decided to follow the Expedition instead.

The Expedition, which was driven by a person later identified as defendant Chapple, exited the McDonald's and Special Agent Dziedzic followed it onto Mack Avenue. Special Agent Dziedzic also noted that the Expedition had a Kentucky license plate and, after running the license plate, he learned that the Expedition was a rental vehicle. He and his partner had the Expedition in their view the entire time they were following it. The Expedition did not make any stops.

Based on his training and experience, Special Agent Dziedzic believed that he had just witnessed a drug transaction and he decided to coordinate a traffic stop of Chapple's vehicle. According to Special Agent Dziedzic, he was eventually able to get in contact with a dispatcher with the Detroit Police Department and ask if they had a unit in the area that could conduct a traffic stop. He did not go into details as to what the DEA was doing, but he did relay enough

information so that someone could identify the Expedition. Special Agent Dziedzic also testified that he decided not to stop defendant's vehicle himself because he did not want to reveal the ongoing, large-scale DEA investigation. He did not request a narcotics unit.

Special Agent Dziedzic kept updating the dispatcher on his position and the Detroit Police eventually stopped defendant's vehicle. Special Agent Dziedzic observed the traffic stop from a distance. Later went to the police station and asked the police to keep the DEA "out of it." He also took the evidence seized by the police.

Special Agent Dziedzic further testified that, after the traffic stop, and Chapple's release, the DEA intercepted another phone call from Chapple and George Williams in which Chapple reported that the police had seized Vicodin and $2,400 from him.[7]

The fourth witness to testify at the evidentiary hearing was defendant Neil Chapple. Defendant testified that, on October 27, 2008 he was in a Ford Expedition with Kentucky plates coming into Detroit. Defendant also testified that he had a conversation with George Williams on the phone, and that he went to a McDonald's on Mack Avenue expecting to meet George Williams. According to defendant, he did not meet George Williams there and met with someone else instead. Defendant had not met that person before, but he had seen him with George Williams prior and he knew who the person was,

Defendant also testified that he got into the car with the person he recognized and that person gave him a grocery bag. Defendant opened up the bag, looked to see what was in there,

_____

[7]That phone call was entered by the government as its Exhibit #5 at the evidentiary hearing.

and then folded the bag. Defendant placed the bag on his front passenger's seat. According to defendant, he could not see through the bag and, in the condition he left it, no one could tell what was in the bag. To find out what was in the bag, a person would have to unfold the bag and look inside.

Defendant further testified that he drove off and headed to Flanders Street because a friend had called and asked him to come over. When defendant arrived on Flanders, he had to make a u-turn because he passed his friend's house. According to defendant, as he was driving, his friend came out and told defendant that defendant had passed the house again. Defendant turned into a driveway and then started backing out. Defendant testified that he did not see anything as he was backing out, but when he started driving forward again, he noticed a van tailgating him. Defendant also testified that the van had its headlights off and that the streetlights were not working on Flanders. Defendant cannot say how far away the van was when backed out of the driveway because he could not see it then. At the evidentiary hearing, defendant agreed that the police did not have a reason for sneaking up on him.

According to defendant, the van suddenly turned on its police lights and its headlights, and that he stopped his vehicle. Two police officers then approached his vehicle, with their guns drawn, and Sgt. Meinke told him to get out of the car. Defendant testified that he got out of the car and the police placed him in handcuffs. Office Gadwell then began searching the vehicle, found the bag, opened up the bag, and saw the pills. Officer Gadwell asked him about the Vicodin and defendant said that he takes them because of a back injury. Officer Gadwell also asked why defendant had a thousand pills, and defendant responded that he usually buys them on

the street.  Defendant also testified that he asked why he was stopped and the police told him that they had heard gunshots in the area.

Defendant stated at the evidentiary hearing that he was going to take a few of the Vicodin and sell the rest. Defendant does concede that he was trying to get the police to believe that all of his pills were for his personal use.  Defendant also testified that, while he told the police he had prescriptions for Vicodin previously, he never said he had a prescription for the large bottles in his vehicle on that day because there was no way anyone could get a prescription for that amount. Defendant further testified that he did tell the police that it was cheaper to buy the pills on the street than with his insurance.  Defendant also admits to lying to a Michigan State Police Trooper during a separate July 3, 2008 traffic stop because he did not want to get into trouble.

According to defendant, he never took the bottles out of the paper bag and that he had no reason for doing so.  After he was released, defendant called George Williams and told him that the police had stopped him after hearing gunshots in the area and that the police seized the pills. Defendant testified that he was released at the police station after being told that the police had "bigger fish to fry."

### III. Discussion

Chapple moves  to suppress evidence obtained and derived from the traffic stop and search conducted on October 27, 2008.  Both traffic stops and searches of automobiles are within the scope of the Fourth Amendment, see, *e.g.*, Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and, accordingly, any evidence seized during an illegal traffic stop or search

must be suppressed as "fruits of the poisonous tree," <u>Wong Sun v. United States</u>, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); <u>United States v. Blair</u>, 524 F.3d 740, 748 (6th Cir. 2008). "It is well settled that in seeking the suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." <u>United States v. Rodriguez-Suazo</u>, 346 F.3d 637, 643 (6th Cir. 2003) (quoting <u>United States v. Feldman</u>, 606 F.2d 679 n. 11 (6th Cir. 1979).

Here, in light of the parties' arguments, three separate issues must be discussed: the automobile exception to the warrant requirement of the Fourth Amendment; investigatory stops made pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and traffic stops made on the basis of civil infractions. As discussed below, this court finds that, while the search and seizure should not be upheld pursuant to the automobile exception, the evidence in this case should not be suppressed. The stop was both (1) a valid <u>Terry</u> stop based on reasonable suspicion and the collective knowledge of the law enforcement officers involved, and (2) a valid traffic stop based on probable cause to believe that a traffic violation had occurred. Under either analysis, the vehicle was lawfully stopped and the subsequent seizure was lawful under the plain view doctrine.

**A. Automobile Exception**

"[A] search conducted without a warrant issued upon probable cause is *per se* unreasonable, ... subject only to a few specifically-established and well-delineated exceptions." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotation marks omitted). One specific and well-delineated exception is the automobile

exception. "Under this exception, 'in cases where there was probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'" United States v. Cope, 312 F.3d 757, 775 (6th Cir. 2002) (quoting Maryland v. Dyson, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (emphasis omitted). "The automobile exception is applicable even in nonexigent circumstances, so long as the vehicle is mobile and law enforcement officers have probable cause to believe that it contains incriminating evidence." Cope, 312 F.3d at 775 (citing Dyson, 527 U.S. at 466-67). See also United States v. Ross, 456 U.S. 798, 807-09, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (holding that, in accordance with the "automobile exception" to the warrant requirement, an officer's warrantless search of a vehicle does not violate the Fourth Amendment if the officer has probable cause to believe that a vehicle contains contraband.) "The test for 'probable cause' is simply whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (internal quotation marks omitted). "Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." United States v. Smith, 510 F.3d 641, 647-648 (6th Cir. 2007) (internal quotation omitted). The court's determination of whether probable cause existed at the time of the search is a "commonsense, practical question to be judged from the totality-of-the-circumstances." Smith, 510 F.3d at 648 (internal quotation omitted). "In determining whether there was probable cause, the court does not look to events that occurred after the search or to the subjective intent of the officers; rather,

the court looks at the 'objective facts known to the officers at the time of the search.'" <u>Smith</u>,

510 F.3d at 648 (quoting <u>Smith v. Thornburg</u>, 136 F.3d 1070, 1075 (6th Cir. 1998)).

In this case, while acknowledging that Special Agent Dziedzic did not personally conduct

the search of Chapple's vehicle, the government argues his basis for probable cause is still

relevant and that the search was still proper pursuant to the automobile exception given the

collective knowledge of the law enforcement personnel in this case.  Courts evaluate the

collective information of all the officers involved in determining whether their actions are

proper, whether that action be an arrest, a search, or a <u>Terry</u> stop.  <u>See</u>, <i>e.g.</i>, <u>United States v.

Hensley</u>,  469 U.S. 221, 232, 105 S.Ct. 675, 682 (1985) (concluding that, if a flyer or bulletin has

been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted

person has committed an offense, then reliance on that flyer or bulletin justifies a <u>Terry</u> stop);

<u>United States v. Braggs</u>, 23 F.3d 1047, 1049 (6th Cir. 1994) ("Reasonable suspicion can be

based upon police officers' own observations or upon the collective knowledge of other

officers."); <u>United States v. Perkins</u>, 994 F.2d 1184, 1187 (6th Cir. 1993) (upholding a search

because "[c]ollectively, the officers in this case had ample probable cause to stop and search the

vehicle being driven by [the defendant].");  <u>United States v. Hensley</u>, 713 F.2d 220, 223 (6th Cir.

1983), rev'd on other grounds, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) ((collecting

cases and recognizing the general rule that "probable cause for arrest may emanate from

collective police knowledge); <u>United States v. Fofo</u>, 39 Fed. Appx. 180, 183 (6th Cir. 2002)

((permitting a search pursuant to the automobile exception where there was no question that the

collective knowledge of law enforcement personnel cooperating on the case gave them probable

cause to believe that heroin was being transported in the rental car); <u>United States v. Valencia</u>, 913 F.2d 378 (7th Cir.1990) (state officers' arrest of suspect based on DEA agent's probable cause suffices for fourth amendment inquiry).  Moreover, in determining whether actions are proper, courts must evaluate the collective information of all the officers involved, including cooperating federal and local authorities.  <u>Feathers v. Aey</u>, 319 F.3d 843 (6th Cir. 2003); <u>Srisavath v. City of Brentwood</u>, 243 Fed. Appx. 909 (6th Cir. 2007); <u>Cansler v. City of Henderson</u>, No. 4:06-CV-89-M, 2008 WL 4500041, *5 (W.D. Ky. October 2, 2008) (McKinley, J.).

In particular, where one law enforcement officer is directed to do something by another, the court must look at the first officer's knowledge in determining whether the second officer's actions were proper.  <u>See</u>, <u>e.g.</u>, <u>Hensley</u>,  469 U.S. 221; <u>Whiteley v. Warden</u>, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).  In <u>Hensley</u>, a police officer conducted a traffic stop of the defendant's vehicle pursuant to a flyer, issued by another police department, stating that Hensley was wanted for investigation of an aggravated robbery.  <u>Hensley</u>, 469 U.S. at 223.  The United States Supreme Court subsequently held that, when a <u>Terry</u> stop is made in reliance on a flyer, the propriety of the stop turns on whether the officers who issued the flyer possessed a reasonable suspicion to make the stop and not on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance. <u>Hensley</u>, 469 U.S. at 229-233.  Similarly, in <u>Whiteley</u>, a county sheriff in Wyoming obtained an arrest warrant for a person suspected of burglary and issued a message through a statewide law enforcement radio network describing the suspect, his car, and the property taken.  At least one

version of the message also indicated that a warrant had been issued.  Whiteley, 401 U.S. at 564

and n. 5.  The message did not specify the evidence that gave the sheriff probable cause to

believe the suspect had committed the breaking and entering.  Whiteley, 401 U.S. at 562-564.  In

reliance on the radio message, police in Laramie stopped the suspect and searched his car.

Whiteley, 401 U.S. at 563. The United States Supreme Court ultimately concluded that the

sheriff had lacked probable cause to obtain the warrant and that the evidence obtained during the

search by the police in Laramie had to be excluded.  In so ruling, however, the Court noted:

> We do not, of course, question that the Laramie police were
> entitled to act on the strength of the radio bulletin.  Certainly
> police officers called upon to aid other officers in executing arrest
> warrants are entitled to assume that the officers requesting aid
> offered the magistrate the information requisite to support an
> independent judicial assessment of probable cause.  Where,
> however, the contrary turns out to be true, an otherwise illegal
> arrest cannot be insulated from challenge by the decision of the
> instigating officer to rely on fellow officers to make the arrest.

[Whiteley, 401 U.S. at 568.]  Thus, "had the sheriff who issued the radio bulletin possessed

probable cause for arrest, then the Laramie police could have properly arrested the defendant

even though they were unaware of the specific facts that established probable cause."  Hensley,

469 U.S. at 230-231 (describing the holding in Whiteley).

The reasons for examining the collective knowledge of law enforcement officers when

one officer directs another to do something is clear.  As stated by the Supreme Court:

> In an era when criminal suspects are increasingly mobile and
> increasingly likely to flee across jurisdictional boundaries, this rule
> is a matter of common sense: it minimizes the volume of
> information concerning suspects that must be transmitted to other

> jurisdictions and enables police in one jurisdiction to act promptly
> in reliance on information from another jurisdiction.

[Hensley, 469 U.S. at 231.]  Stated another way, "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."  Humphrey v. Mabry, 482 F.3d 840, 848-849 (6th Cir. 2007) (quoting Hensley, 469 U.S. at 231).

While law enforcement personnel need not provide one another with specific facts justifying an action when directing or asking for an action to be done, what is said does matter and it is the objective reading of a message that determines whether other law enforcement officers can defensibly act in reliance on it and what actions they can take.  See, e.g., Hensley 469 U.S. at 233 ("It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it.").  For example, in Hensley, the flyer twice stated that Hensley was wanted for investigation of an aggravated robbery, described both Hensley and the date and location of the alleged robbery, and asked other departments to pick up and hold Hensley for the St. Bernard police in the event he were located.  Hensley, 469 U.S. at 223.  The flyer also warned other departments to use caution and to consider Hensley armed and dangerous.  Hensley, 469 U.S. at 223.  Examining the flyer issued by the St. Bernard police, the Supreme Court determined that an objective reading of the entire flyer would lead an experienced officer to conclude that Hensley was at least wanted for questioning and investigation in St. Bernard, and that another officer could therefore rely on the flyer and

conduct a brief <u>Terry</u> stop to check Hensley's identification, pose questions, and inform the suspect that the St. Bernard police wished to question him. <u>Hensley</u>, 469 U.S. at 234. An experienced officer could also assume that a warrant might have been obtained in the period after the flyer was issued and, accordingly, the flyer would further justify a brief detention at the scene of the stop while officers checked whether a warrant had in fact been issued. <u>Hensley</u>, 469 U.S. at 234. As stated by the Supreme Court, "what matters is that the stop and detention that occurred were in fact no more intrusive than would have been permitted an experienced officer on an objective reading of the flyer." <u>Hensley</u>, 469 U.S. at 234-235. In particular, the Supreme Court noted that, while the flyer asked other departments to pick up and hold Hensley for St. Bernard instead of requesting that other police departments briefly detain Hensley merely to check his identification or confirm the existence of a warrant, an objective reading of the flyer might not justify such a detention, whether at the scene or at the Covington police headquarters, given the distance involved and the time required to identify and communicate with the department that issued the flyer. <u>Hensley</u>, 469 U.S. at 235. According to the Supreme Court, "such a detention might well be so lengthy or intrusive as to exceed the permissible limits of a <u>Terry</u> stop." <u>Hensley</u>, 469 U.S. at 235 (citation omitted). However, because such a situation did not occur, the Supreme Court only held that the "flyer, objectively read and supported by a reasonable suspicion on the part of the issuing department, justified the length and intrusiveness of the stop and detention that actually occurred." <u>Hensley</u>, 469 U.S. at 235.

In <u>Blair</u>, a police officer, Officer Munday, was working in an undercover capacity and observed an individual later identified as the defendant, Marcus Blair, engage in a hand to hand

transaction outside of a house and then drive away. <u>Blair</u>, 524 F.3d at 744. Officer Munday believed the transaction to be drug related, but decided he lacked probable cause for an arrest because he could not determine what items had been exchanged. <u>Blair</u>, 524 F.3d at 744-745. Officer Munday radioed another officer, Officer Holmes, of the possible drug transaction but did not instruct Officer Holmes to pull Blair over. <u>Blair</u>, 524 F.3d at 745. Nonetheless, when Officer Holmes saw Blair's car approach from the direction of the suspect house, Officer Holmes pulled over Blair's vehicle upon suspicion that the "tag-light," or license plate light, was burned out. The officer also noticed that Blair was "'a little fidgety' and was reaching underneath the seats of his vehicle." <u>Blair</u>, 524 F.3d at 745. The officer informed Blair that he had been pulled over for a tag-light violation, obtained Blair's license, and ran a check revealing that Blair's license was valid and that he had no outstanding warrants. <u>Blair</u>, 524 F.3d at 745. Officer Munday, having heard Blair's name over the radio, informed Officer Holmes that during a previous encounter Blair had been armed and had attempted to flee. <u>Blair</u>, 524 F.3d at 745. Officer Holmes then asked Blair for permission to search his car. <u>Blair</u>, 524 F.3d at 746. Blair refused, and Officer Holmes continued to press, telling Blair that he was not under arrest, but that the area was known for drugs and he had reason to believe Blair possessed narcotics. <u>Blair</u>, 524 F.3d at 746. Officer Munday then arrived and identified Blair's vehicle as the one Officer Munday had observed. <u>Blair</u>, 524 F.3d at 746. Upon Blair's continued refusal to consent to a search, Officer Holmes called in a canine unit. After the canine unit arrived, Officer Holmes ordered Blair to exit the vehicle and observed Blair reach underneath the seats and toward his

ankle area as he was exiting the vehicle.  Blair, 524 F.3d at 746.  Officer Holmes told Blair to stop reaching, searched him, and found several bags of crack cocaine.  Blair, 524 F.3d at 746.

With respect to the collective knowledge of the officers involved in Blair, the Sixth Circuit held:

> The government contends that the hand-to-hand transaction could justify a Terry stop based on the collective knowledge of Officers Munday and Holmes.  We reject this argument.  The government cites United States v. Barnes, 910 F.2d 1342, 1344 (6th Cir. 1990), for the unremarkable proposition that one officer may conduct a Terry stop based on information obtained from another officer. According to Officer Holmes's own testimony, however, he did not obtain information regarding the hand-to-hand transaction until after the stop occurred.  The government's reliance on United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), is similarly misplaced, as the case is readily distinguishable.  In Hensley, the Court upheld a Terry stop by one police department premised on a "wanted" flyer issued by another department. The flyer contained information that the defendant was wanted for investigation of an aggravated robbery.  Id. at 223, 105 S.Ct. 675.  The Court concluded that because the department that issued the flyer had reasonable, articulable facts that would justify a Terry stop, the other department could rely on the flyer. Id. at 235., 105 S.Ct. 675.  In the case at hand, however, Officer Munday never communicated why Blair should be stopped, or even that he should be stopped at all. According to Officer Holmes, the only information he received prior to the stop was that a car was leaving the suspect house. As a result, Hensley does not apply.

[Blair, 524 F.3d at 751 -752.]

In this case, Sgt. Meinke testified that he and Officer Gadwell received a message from dispatch that DEA was looking for someone to stop a vehicle.  Sgt. Meinke did not know if the DEA just wanted the vehicle or the driver identified, but he assumed that the request had

something to do with narcotics because the request came from the DEA.  Officer Gadwell testified that they received some vague information over the radio about a unit looking to stop a vehicle.  He did not know who made the request.  Special Agent Dziedzic testified that, when coordinating the traffic stop with dispatch, he did not go into details as to what the DEA was doing, and that he merely relayed enough information so that someone could identify the Expedition.

Viewing the information communicated to the police officers objectively, they could not defensibly act in reliance on that communication when searching Chapple's vehicle.  Sgt. Meinke and Officer Gadwell were told to stop the vehicle in question, not search it.  While law enforcement personnel need not provide one another with specific facts justifying an action when directing or asking for an action to be done, what is said does matter and nothing said in this case suggests that the police officers could objectively rely on the directions given to them when searching the vehicle.  The government cites to <u>Hensley</u> and <u>Blair</u> in support of its argument, but this court finds those cases distinguishable with respect to this issue as neither of those cases involved a search made pursuant to the automobile exception.  In <u>Hensley</u>, a police officer relied on a wanted flyer in making a <u>Terry</u> stop.  <u>Hensley</u>, 469 U.S. at 235.  Similarly, in <u>Blair</u>, the Sixth Circuit suggested that a police officer could make a <u>Terry</u> stop if another officer communicated why a defendant should be stopped or that a defendant should be stopped, <u>Blair</u>, 524 F.3d at 751 -752.  A search pursuant to the automobile exception is different from a <u>Terry</u> stop and, while the collective knowledge doctrine applies to such searches, <u>see</u>, *e.g.*, <u>Perkins</u>, 994 F.2d at 1187; <u>Fofo</u>, 39 Fed. Appx. at 183, the law enforcement officers conducting the search

must have been involved in the decision to make the search or have been told to search the car. It is the objective reading of a message that determines whether other law enforcement officers can defensibly act in reliance on it and what actions they can take, Hensley, 469 U.S. at 233, and the police officers in this case could not defensibly act in reliance on the communications they received when searching Chapple's vehicle.

In its supplement brief, the government correctly argues that the collective knowledge doctrine allows local officers to make drug stops at the request of federal officers without being given a full explanation of the probable cause possessed by the DEA. However, while that may be true, in this case the Detroit Police officers were not told to make a drug stop or search the vehicle. They were just told to stop the vehicle and, without anything more, and they could not defensibly act in reliance on the communication from the dispatcher when searching Chapple's vehicle. Consequently, the search was not proper under the automobile exception and the evidence obtained or derived from the traffic stop is not admissible on that basis.

**B. *Terry* Stop**

While the stop and search were not proper pursuant to the automobile exception, Chapple's motion should still be denied because the stop was a lawful Terry stop, based on the collective knowledge of the law enforcement officers involved, and the seizure was lawful under the plain view doctrine.

Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), governs traffic stops made on the basis of suspected criminal activity. Pursuant to Terry, a warrantless encounter may be countenanced under the Fourth Amendment if an officer has reasonable suspicion that

criminal activity may be afoot.  United States v. Campbell, 549 F.3d 364, 370 -371 (6th Cir.

2008).  Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood

of criminal activity less than probable cause, and falls considerably short of satisfying a

preponderance of the evidence standard.  If an officer possesses a particularized and objective

basis for suspecting the particular person of criminal activity based on specific and articulable

facts, he may conduct a Terry stop."  Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008)

(quoting Smoak v. Hall, 460 F.3d 768, 778-79 (6th Cir. 2006)).  A Terry stop must be supported

by specific and articulable facts that would "warrant a man of reasonable caution in the belief

that the action taken was appropriate."  Terry, 392 U.S. at 21-22 (citations omitted).  In other

words, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized

suspicion or hunch' of criminal activity."  Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673,

145 L.Ed.2d 570 (2000) (citing Terry, 392 U.S. at 27, 88 S.Ct. 1868).  A court considers the

totality of the circumstances to determine the validity of a Terry stop.  Blair, 524 F.3d at 750.

During a Terry stop,  the officer may conduct a brief traffic stop for investigative purposes and

make reasonable inquiries to confirm or dispel his suspicions.  United States v. Butler, 223 F.3d

368, 374 (6th Cir. 2000).

    As discussed above, the reasonable suspicion for a Terry stop can be based on the

collective knowledge of law enforcement officers.  See, *e.g.*, Braggs, 23 F.3d at 1049.

Moreover, where one law enforcement officer is directed to do something by another, the court

must look at the first officer's knowledge in determining whether the second officer's actions

were proper, so long as the second officer can defensibly act in reliance on the communication in

taking whatever actions he takes.  Hensley, 469 U.S. 221, 233.  Here, described above, Sgt.

Meinke and Officer Gadwell were told to stop defendant's vehicle and, while they were not told

why, the direction was clear and they could objectively rely on it when stopping defendant's

vehicle.  In Hensley, a police officer relied solely on the wanted flyer in making a Terry stop,

Hensley, 469 U.S. at 235, while, in Blair, the Sixth Circuit suggested that a police officer could

make a Terry stop if another officer communicated why a defendant should be stopped or that a

defendant should be stopped, Blair, 524 F.3d at 751 -752.  Here, Sgt. Meinke and Officer

Gadwell were told to stop defendant's vehicle and they could defensibly act in reliance on the

direction and information given to them in making a Terry stop.

Given that the police officers could defensibly act in reliance on the directions given

them when stopping defendant's vehicle, the court must look at Special Agent Dziedzic's

knowledge in determining whether the troopers' actions were proper.  See, e.g., Hensley,  469

U.S. 221; Whiteley, 401 U.S. at 568.  Here, Special Agent Dziedzic had a reasonable suspicion

that criminal activity may be afoot and, therefore, the Terry stop was lawful.  Campbell, 549

F.3d at 370 -371.  According to Special Agent Dziedzic, on the basis of an investigation that he

was leading, the DEA had determined through its investigation that George William was the lead

person in an organization engaged in a scheme of illegal conduct involving prescription drug

controlled substances and fraudulent health care billings.  As part of that scheme, George

Williams and his associates recruited fake patients to see doctors employed by them.  The

patients were paid up to $220 for their time and use of their Medicare card, but they did not

retain the prescriptions.  Instead, George Williams and his associates, including Ernest Larry

Adams, had them filled at various cooperating pharmacies. Employees such as Adams were then directed to deliver the controlled substances to distributers in exchange for money.

Moreover, on a number of occasions prior to October 27, 2008, Special Agent Dziedzic had exploited the information gained from the wiretaps and coordinated traffic stops of vehicles containing drugs. On October 27, 2008 in particular, Special Agent Dziedzic received a phone call from the investigator monitoring the wiretap. According to that investigator, it appeared, on the basis of intercepted phone calls, that George Williams was waiting for someone and that a deal was going to take place at a McDonald's. Special Agent Dziedzic and his partner drove to a location they had previously observed drugs being taken in and out of. From that location, he followed Adams to a nearby McDonald's and observed Adams transfer a bag to defendant's vehicle.

A court considers the totality of the circumstances to determine the validity of a <u>Terry</u> stop, <u>Blair</u>, 524 F.3d at 750, and, given the circumstances here, Special Agent Dziedzic possessed a particularized and objective basis for suspecting defendant of criminal activity based on specific and articulable facts. Accordingly, Special Agent Dziedzic could request a <u>Terry</u> stop. <u>Dorsey</u>, 517 F.3d at 395.

Defendant argues that, even if the initial stop was valid, the evidence from the traffic stop must still be suppressed because it was a warrantless seizure and no exception to the warrant requirement applies. Unless an exception applies, a warrant is generally required to permit law enforcement officers to search a place or seize an item. <u>United States v. McLevain</u>, 310 F.3d 434, 438 (6th Cir. 2002). The law, however, "recognizes the plain view doctrine as an exception

to the warrant requirement." United States v. Garcia, 496 F.3d 495, 508 (6th Cir. 2007). In order for the plain view doctrine to apply, the following four factors must be met: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." Garcia, 496 F.3d at 508. In this case, defendant argues that the pills seized were not in plain view and that it was not readily apparent that the pills seized were contraband or intrinsically incriminating.

With respect to whether the seized bottles were in plain view, Officer Gadwell testified that, from his position outside of defendant's front passenger's window, he could see two large bottles of pills on the front passenger seat and a Hydrocodone label on one of the bottles. According to Officer Gadwell, the interior lights of the car were on and he also illuminated the front passenger's seat with a flashlight. Officer Gadwell also testified that, when subsequently searching the entire vehicle, and he found a folded up, brown paper bag on the floor of the front passenger side. Special Agent Dziedzic then observed Adams exit his vehicle while carrying a bag. Special Agent Dziedzic testified that he could not see inside or through the bag Adams left in defendant's vehicle. Defendant testified that, after receiving the bag, he opened it up and looked inside. Defendant also testified that he then folded the bag and placed it on his front passenger's seat. According to defendant, he could not see through the bag and, in the condition he left it, no one could tell what was in the bag. To find at what was in the bag, a person would have to unfold the bag and look inside.

On the basis of that evidence, this court finds that the seized bottles were in plain view. Officer Gadwell testimony was credible on the issue of whether he could see the bottles and one of the labels. Defendant argues that Officer Gadwell is not credible because the police report relating to this incident omitted the DEA's request to stop the vehicle, but that information was omitted at the request of the DEA so as not to compromise the ongoing investigation. Moreover, defendant admitted to lying to the police during both this encounter and the July 3, 2008 traffic stop charged as Count Four. Given defendant's lack of credibility, as well as the trustworthiness of Officer Gadwell, this court finds that the seized bottles were in plain view.

Defendant also argues that it was not readily apparent that the pills seized were contraband or intrinsically incriminating. Determining whether the object's incriminating nature is "immediately apparent" does not require "an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir.1997) (quoting Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502,. 741-42 (1983)). The government bears the burden of proving the legality of a seizure under the plain view doctrine. United States v. Herndon, 501 F.3d 683, 692 (6th Cir. 2007). Additionally, in United States v. Garcia, 496 F.3d 495 (6th Cir. 2007), the Sixth Circuit explained:

> [I]n determining whether an object's incriminating nature is "immediately apparent," we look to three factors, none of which is necessary but each of which is instructive: (1) "a nexus between the seized object and the items particularized in the search warrant"; (2) "whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity"; and (3) whether "the executing officers can

at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." Id. (quoting United States v. Beal, 810 F.2d 574, 576-77 (6th Cir. 1987)). In addition to these three factors, we have specifically held that an object's incriminating nature is not immediately apparent if it "appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity[.]" Shamaeizadeh v. Cunigan, 338 F.3d 535, 555 (6th Cir. 2003) (quoting McLevain, 310 F.3d at 443). Moreover, the officer must recognize the incriminating nature of an object as a result of his "immediate" or "instantaneous sensory perception."

[Garcia, 496 F.3d at 510-511.]

Here, Officer Gadwell observed two large bottles of pills, with one of the bottles being labeled Hydrocodone. As testified to by Officer Gadwell, he knows, through his experience working in narcotics, that Hydrocodone is strictly regulated and that bottles of the size at issue here are commonly stolen from pharmacies, with the pills being sold illegally. Officer Gadwell also testified that bottles of the size in defendant's vehicle, and with that many pills, are never given out as prescriptions. Defendant confirmed that last statement when he testified that, while he told the police he had prescriptions for Vicodin previously, he never said he had a prescription for the large bottles in his vehicle because there was no way anyone could get a prescription for that amount. Given the sheer size of the bottles and the label, Officer Gadwell had probable cause to believe that they were associated with criminal activity.

### C. Civil Infraction

A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. Blair, 524 F.3d at 748 (citations omitted). Probable cause is a

reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). Put another way, "[t]he requirements of probable cause are satisfied 'where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.'" United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005) (internal quotations omitted). When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant, Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and "police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).

In this case, both Sgt. Meinke and Officer Gadwell testified that they conducted a traffic stop after defendant backed out of a driveway and almost crashed into them. Defendant testified that he did not see anything as he was backing out, but when he started driving forward again, he noticed a van tailgating him. Defendant also testified that the van had its headlights off and that the streetlights in the area were not working. At the evidentiary hearing, defendant agreed that the police did not have a reason for sneaking up on him.

This court finds that Sgt. Meinke and Officer Gadwell had probable cause to believe that a civil traffic violation has occurred. Both police officers were consistent in their testimony relating to the traffic stop and this court finds them to be credible. Defendant is less credible for

the reasons discussed above. Moreover, defendant's testimony that the police van had its headlights off, which defendant believes is a common tactic for sneaking up on people, does not make any sense. The two police officers were expressly looking for defendant and they had no reason to sneak up on him, as conceded by defendant at the evidentiary hearing.

If the police officers legally stopped defendant's vehicle on the basis that they had probable cause to believe that a civil traffic violation has occurred, then the subsequent seizure would be lawful under the plain view doctrine for the reasons discussed above.

## IV. Conclusion

For the reasons discussed above, this court recommends that defendant Chapple's motion to suppress be **DENIED** and that the evidence obtained or derived from the October 27, 2008 traffic stop not be suppressed. The stop was both (1) a valid <u>Terry</u> stop based reasonable suspicion and the collective knowledge of the law enforcement officers involved, and (2) a valid traffic stop based on probable cause to believe that a traffic violation had occurred. Under either analysis, the vehicle was lawfully stopped and the subsequent seizure was lawful under the plain view doctrine.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508 (6th Cir. 1991); <u>United States v. Walters</u>, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues,

but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991); <u>Smith v. Detroit Fed'n of Teachers Local 231</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.


S/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge


Dated: March 1, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on March 1, 2010.

s/J. Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan