UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,                  CRIMINAL NO. 09-20224

        v.                      DISTRICT JUDGE VICTORIA A. ROBERTS

ERNEST LARRY ADAMS (D-5),      MAGISTRATE JUDGE VIRGINIA M. MORGAN

        Defendant.[1]
_____/

## REPORT AND RECOMMENDATION
## TO DENY DEFENDANT ERNEST LARRY ADAMS'
## MOTION TO SUPPRESS (D/E #131)

## I. Introduction

       This matter comes before the court on defendant Ernest Larry Adams' Motion to

Suppress (D/E #131).  The government filed a response in opposition to the motion (D/E #136)

and this court heard oral arguments and conducted an evidentiary hearing with respect to the

motion on January 15, 2010 and February 12, 2010.  For the reasons discussed below, the court

recommends that defendant Adams' motion be **DENIED** and that the evidence obtained or

derived from the October 16, 2008 traffic stop not be suppressed.

_____

     [1]Defendant Adams was indicted along with ten co-defendants: George Williams, Brandon
Williams, Nancy Williams, Yolando Young, Webb Smith, Neil Chapple, Gregory Palmer,
Nathaniel Darryl Williams, Anthony Richardson, and Katrina Lyons.

## II. Background

### A. Indictment

In this case, defendant Adams and ten co-defendants are charged together in an Indictment (D/E #4). In the "General Allegations" section of the indictment, the government alleges that the named defendants and others engaged in a scheme and pattern of illegal conduct involving prescription drug controlled substances and fraudulent health care billings. (Indictment, p. 1) The Indictment alleges that George Williams organized and operated a purported health care business under the name Quick Response Medical Professionals, P.C. ("QRMP"). (Indictment, pp. 1-2) Brandon Williams and Nancy Williams assisted in the creation and operation of QRMP. (Indictment, p. 3) Brandon Williams and Nancy Williams are also alleged to have caused fraudulent Medicare billings in connection with QRMP. (Indictment, p. 3)

According to the Indictment, George Williams recruited fake patients to see doctors employed by QRMP, with QRMP employee Yolanda Young scheduling the visits and instructing the patients to ask for particular controlled substance prescriptions with a high street value. (Indictment, p. 2) Other employees of QRMP included Gregory Palmer and Darryl Williams, who transported most of the patients, and Anthony Richardson, who worked as a security guard protecting the cash and keeping order. (Indictment, p. 2)

The patients were paid up to $220 for their time and use of their Medicare card, but they did not retain the prescriptions. (Indictment, p. 2) The prescriptions were retained by George Williams, who had them filled at various cooperating pharmacies. (Indictment, p. 2) The

controlled substances were then picked up by George Williams, Webb Smith, and/or defendant. (Indictment, p. 2)  Employees such as Smith or defendant were then directed to deliver the controlled substances to distributers in exchange for money.  (Indictment, p. 2)  One of the alleged distributers was Katrina Lyons.  (Indictment, pp. 2-3)

Ernest Larry Adams is charged in Count One ("21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances"); Count Five ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances - Cough Syrup with Codeine"); Count Six ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances -Oxycodone"; Count Seven ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances -Oxycodone"); Count Eight ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances -Vicodin")[2]; Counts Nine, Thirteen and Sixteen ("21 U.S.C. § 841 (a)(1), 18 U.S.C. § 2 - Possession with Intent to Distribute a Controlled Substance, aiding and abetting"); and Count Eighteen ("Forfeiture Allegations (18 U.S.C. 981(a)(1)(C), and 28 U.S.C. 2461(c); 21 U.S.C. § 853)").  Count Six is the subject of the motion before the court and it specifically alleges that defendant possessed Oxycontin (Oxycodone), with an intent to distribute, on October 16, 2008.

### B. Motion to Suppress

---

[2]According to the government, due to a clerical error, the Indictment refers to Oxycontin in Count Eight when the drug actually seized was Vicodin.  The government also asserts that the error will be corrected before trial by either a stipulation or a superseding indictment.

On December 14, 2009, defendant Adams filed the motion to suppress pending before the court (D/E #131). In that motion, defendant argues that the initial traffic stop was improper, the pills seized were not in plain view, it was not readily apparent that the pills seized were contraband or intrinsically incriminating, and defendant's car was searched without probable cause.

On January 4, 2010, the government filed a response to defendant's motion to suppress (D/E #136); arguing that the collective knowledge of the DEA and the Michigan State Police provided probable cause to search defendant's vehicle pursuant to the automobile exception to the warrant requirement of the Fourth Amendment.

## C. Evidentiary Hearing

On January 15, 2010, this court heard oral arguments and conducted an evidentiary hearing with respect to defendant's motion. Three witnesses testified on that day.

The first witness to testify at the evidentiary hearing was Michigan State Police Trooper Jack Taeff. Trooper Taeff testified that, on October 16, 2008, he was on regular road patrol in the evening when he and his partner, Trooper Jonathan Henry, received a communication from dispatch advising them that the DEA was requesting assistance in conducting a traffic stop. Trooper Taeff also testified that dispatch told them to stop the vehicle for the DEA. They were given a vehicle description and a license plate number. They were also told that told it was going to be a stop for prescription narcotics. Trooper Taeff did not hear the conversation between dispatch and the DEA.

According to Trooper Taeff, he was driving a marked patrol vehicle and he located the vehicle that the DEA wanted stopped, a Ford Taurus, on westbound I-94 as it was getting on to the Lodge Freeway. Trooper Taeff followed the Taurus onto the Lodge as it traveled northbound. Trooper Taeff testified that, as he was following the vehicle, he observed that it was speeding. The posted speed limit in that area was fifty-five miles per hour and the Taurus was going sixty-five miles per hour. Trooper Taeff also testified that he determined the vehicle's speed by "pacing" it for almost two miles. As described by Trooper Taeff, pacing a vehicle is basically staying behind it at the same distance for a period of time. By not gaining or falling behind from the vehicle as you pace, you can determine that you are going the same speed.

After determining the Taurus' speed, Trooper Taeff activated the emergency lights on the patrol vehicle and the Taurus pulled over to the shoulder of the road. According to Trooper Taeff, this stop occurred at approximately 7:00 p.m. Trooper Taeff also testified that he made contact with the driver of the Taurus, defendant Adams, outside of the front driver's side door and he advised defendant of the reason for the stop. Trooper Taeff further testified that Trooper Henry then began asking defendant about something on the front passenger's side floorboard. Trooper Taeff could see a black bag on the floor, but he could not see its contents. He does not recall if the bag had handles, or if it was open or closed. Trooper Taeff also does not recall if the car's dome light was on at that time. Trooper Taeff testified that Trooper Henry had the better view of the front passenger's side floorboard and Trooper Henry took over the questioning of defendant. Trooper Taeff does not recall if Trooper Henry was leaning on the front passenger's

side door at that time, but he knows that Trooper Henry did not reach in and take the bag. However, the bag was within reaching distance.

According to Trooper Taeff, defendant was asked to exit the vehicle and Trooper Taeff stood with him, behind the Taurus, while items were seized from the vehicle by Trooper Henry. Trooper Henry handled all of the evidence. Trooper Taeff also testified that Trooper Henry later showed him the contents of the black bag. There were six white bags, stapled at the top, with prescriptions on the outside.

Trooper Taeff subsequently issued defendant a citation for speeding. Defendant was released from the scene with his vehicle. Following the encounter, Trooper Henry wrote a police report. Trooper Taeff did not write his own report, but he did review the report written by Trooper Henry. At the evidentiary hearing, Trooper Taeff conceded that there was nothing in the report about the DEA. According to Trooper Taeff, the DEA requested that it not be mentioned.

The second witness to testify at the evidentiary hearing was Michigan State Police Trooper Jonathan Henry. Trooper Henry testified that, on October 16, 2008, he was on road patrol with Trooper Taeff when they received instructions from dispatch to assist the DEA in a traffic stop. Trooper Henry also testified that the instructions stated that the DEA was following a vehicle that they wanted stopped and that there was some type of medication in the vehicle that the DEA wanted recovered. The instructions also described the vehicle in question as a Ford Taurus.

According to Trooper Henry, after they located the Taurus traveling northbound on the Lodge from the westbound I-94 ramp, pace was made by Trooper Taeff and the Taurus was stopped. However, Trooper Taeff did not tell Trooper Henry that he was pacing the vehicle and Trooper Henry was not looking at the speedometer as they followed the vehicle for one and a half miles. According to Trooper Henry, pace determinations for speeding are common and there was no radar in the patrol vehicle he and Trooper Taeff were using that day. Trooper Henry also stated that, while they did not have to come up with their own reason to stop the vehicle, they always like to have their own reason. Here, Trooper Henry testified that dispatch did not say the stop had to be immediate and he read the request as DEA wanting them to have their own reason for the stop.

Via the patrol vehicle's public address system, Trooper Henry asked the driver of the vehicle, later identified as defendant, to roll down the car's windows, turn the car off and place the keys on the dashboard. Defendant complied with those requests. Trooper Henry approached on the passenger's side of the Taurus and made contact with defendant. Trooper Taeff starting asking questions first, but Trooper Henry interrupted him and asked questions as well in an attempt to confuse defendant. Trooper Henry does not recall if he was leaning on passenger window.

Trooper Henry also testified that, from his position at the front passenger's side door, he saw a black shopping bag containing pharmacy bags on the front passenger's side floorboard. He does not recall if the bag had handles, but it was open enough so that Trooper Henry could see inside. The black bag was a thin shopping bag and it contained white paper bags like the

type people receive medications in. The smaller white bags had stickers or labels on them. They were also stapled at the top. According to Trooper Henry, in light of the dispatch report, these bags were what the troopers were looking for and he asked defendant about them. Defendant said he was going to deliver them the next morning as part of his job. Trooper Henry asked why defendant did not deliver them now and defendant did not have an answer. Trooper Henry also asked for an authorization showing that defendant was to pick up and deliver prescription drugs, but defendant did not have any. Defendant just said that all he had was his word. At the evidentiary hearing, Trooper Henry conceded that there is no law prohibiting a person from picking up a prescription for someone else.

Trooper Henry eventually removed the black bag from the vehicle. Trooper Henry testified that he looked inside the bag and found several prescriptions for different individuals. None of the prescriptions were for defendant. According to Trooper Henry, in his experience, some of the prescription drugs he found in the bag were more valuable than others in the street market. Trooper Henry also testified that Oxycontin was the most valuable drug found here. The black bag was confiscated.

Trooper Henry further testified that he found two folders containing forms and a doctor's name. The folders were on the floorboard in the rear passenger's side part of the car. Trooper Henry seized those folders as well after scanning them and determining that they would be important to other evidence.

When searching the car, Trooper Henry also found a small white bottle with pink residue near the center console in the front passenger area. Trooper Henry recognized the pink residue

as Methadone and, in his experience, Methadone is used by recovering heroin addicts. Trooper Henry asked about defendant about the Methadone and defendant said that, while he had taken Methadone before, he was not currently taking it. That small white bottle was not seized.

Trooper Henry also testified that defendant was issued a citation and released. Trooper Henry further testified that he wrote the police report relating to this encounter and that the report does not contain anything about the DEA. According to Trooper Henry, he was asked by the DEA to omit any reference to it. Trooper Henry turned the seized evidence over to the DEA.

The third witness to testify at the evidentiary hearing was Special Agent Christopher Dziedzic of the DEA. Special Agent Dziedzic testified that, in October of 2008, he was involved in a investigation of George Williams and others known as the QRMP investigation. This investigation initiated in June of 2007 after a traffic stop of a vehicle, bearing a Kentucky license plate and heading toward Kentucky from Michigan, resulted in the seizure of approximately sixty-one bottles of cough syrup, of which fifty-five bore the name of a Dr. Ebreo as the prescribing physician. The cough syrup seized is a Schedule Five narcotic. According to Special Agent Dziedzic, there were also other seizures after June of 2007 relating to the investigation.

Special Agent Dziedzic also testified that, by October of 2008, the DEA investigation had led to a wire taps on cellular phones utilized by co-defendants George Williams and Yolando Young. Moreover, according to Special Agent Dziedzic, from the investigation and wiretaps, the DEA had determined that Young was the scheduler and coordinator of fake patients seen by Dr. Ebreo and that, essentially, the fake patients would come in and allow the QRMP

organization to use their Medicare information for the purpose of obtaining prescriptions for common drugs such as Oxycontin, cough syrup, and Xanax. The fake patients would be paid approximately $220 for a visit and the QRMP organization would then actually bill Medicare. The QRMP organization would also keep possession of all of the prescriptions that were issued to the fake patients.

Special Agent Dziedzic further testified that, after retaining possession of the prescriptions, George Williams and his associates would coordinate with cooperating pharmacies and have the prescriptions filled. According to Special Agent Dziedzic, around October of 2008, the main pharmacy used was the East Side Discount Pharmacy. Special Agent Dziedzic also testified that the prescription drugs would be picked up and then divided for resale on the street.

With respect to defendant, Special Agent Dziedzic testified that, during the course of the investigation, the DEA had observed defendant with George Williams and other QRMP associates on several occasions. The DEA had also learned that defendant was a patient of Dr. Ebreo and, it was Special Agent Dziedzic's understanding, that defendant had been issued prescriptions for Oxycontin. Special Agent Dziedzic also knew of another DEA group that had observed defendant, along with Darryl Williams, sell approximately 270 pills of Oxycontin on October 14, 2008 to a man named Michael McDonald.

Special Agent Dziedzic also testified that, around 6:01 p.m. on October 16, 2008, the DEA intercepted a phone call between George Williams and an employee at the East Side

Discount Pharmacy.[3]  In that conversation, George Williams inquired about an order and, after learning that it was ready, told the employee that he was sending his cousin over to pick it up.  A few minutes later, the DEA intercepted a phone call between George Williams and defendant.[4]  In that conversation, George Williams instructed defendant to go to the East Side Discount Pharmacy and pick up the order that George Williams had just inquired about.

Special Agent Dziedzic further testified that, based on the information he had received from the intercepted conversations, he drove to the East Side Discount Pharmacy and started surveillance.  A silver Ford Taurus previously associated with defendant was already there when Special Agent Dziedzic began his surveillance.  According to Special Agent Dziedzic, he eventually observed defendant coming out of the pharmacy while carrying a dark shopping bag.  Special Agent Dziedzic does not recall if the black bag had handles or how defendant carried it out of pharmacy  Defendant got into his vehicle and drove south on Gratiot.

Special Agent Dziedzic also testified that, based on the intercepted phone calls and his own observations he concluded that defendant had just made a pickup for George Williams and that the bag contained prescription drugs that would later be redistributed by George Williams and his associates.  Special Agent Dziedzic also made the decision to follow defendant and coordinate a stop of defendant's vehicle.  Special Agent Dziedzic called the local police post and identified himself.  Special Agent Dziedzic also stated that he was involved in larger

---

[3]The government entered a transcript of that conversation as its Exhibit #1 at the evidentiary hearing.

[4]The government entered a transcript of that conversation as its Exhibit #2 at the evidentiary hearing.

investigation and that he saw a suspect leaving a pharmacy with a bag. Special Agent Dziedzic then gave a license plate number for the vehicle and requested a traffic stop.

Special Agent Dziedzic stated at the evidentiary hearing that he maintain he surveillance of defendant's vehicle until defendant was stopped by the Michigan State Police. Prior to the traffic stop, the DEA intercepted another conversation between George Williams and defendant.[5] As interpreted by Special Agent Dziedzic, that conversation involved defendant asking George Williams if defendant should take the drugs to a location in the city of Detroit that the DEA had previously identified as the location for the doctor visits. George Williams told defendant that George Williams was going to Pontiac that night, and defendant then said that he would hold onto the drugs until the next day.

Special Agent Dziedzic observed the Michigan State Police conduct a traffic stop of defendant's vehicle and, after defendant was released, he took possession of evidence seized by the police. Other drugs besides Oxycontin were seized and not all of the prescriptions were written by Dr. Ebreo. Special Agent Dziedzic also testified that Dr. Ebreo was not the only doctor used by George Williams and his associates at that time. Special Agent Dziedzic explained to the state police about the ongoing investigation and he asked the police to leave the DEA out of their report in order to protect the case and wiretaps.

---

[5]The government entered a transcript of that conversation as its Exhibit #3 at the evidentiary hearing.

Following defendant's release, the DEA intercepted another telephone call between George Williams and defendant.[6]  As interpreted by Special Agent Dziedzic, that conversation involved defendant and George Williams discussing the traffic stop.  Special Agent Dziedzic also noted that, in the conversation, both defendant and George Williams agreed that it was a good thing defendant had the folders in the car because they contained paperwork regarding the prescriptions.

On February 12, 2010, this court continued the evidentiary hearing and oral argument at the request of defendant.  On that date, Special Agent Dziedzic testified as to the chain of custody for the bags and prescriptions seized by the Michigan State Police.  Special Agent Dziedzic also testified that he did not see anything in the black bag as defendant left the pharmacy and that he does not recall how it was carried.  Special Agent Dziedzic further testified that the white bags were stapled and still in the black bag when the evidence was turned over to him by the Michigan State Police.   The court was able to inspect and examine the black plastic bag and the five white prescription bags.  Photographs of the white bags, the labels on the outside of those bags, and the bottles were also examined by the court.

### III. Discussion

Adams moves  to suppress evidence obtained and derived from a traffic stop and search conducted on October 16, 2008.  Both traffic stops and searches of automobiles are within the scope of the Fourth Amendment, see, e.g., Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct.

---

[6]The government entered a transcript of that conversation as its Exhibit #4 at the evidentiary hearing.

2485, 135 L.Ed.2d 1031 (1996); <u>Delaware v. Prouse</u>, 440 U.S. 648, 653, 99 S.Ct. 1391, 59

L.Ed.2d 660 (1979), and, accordingly, any evidence seized during an illegal traffic stop or search

must be suppressed as "fruits of the poisonous tree," <u>Wong Sun v. United States</u>, 371 U.S. 471,

484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); <u>United States v. Blair</u>, 524 F.3d 740, 748 (6th Cir.

2008). "It is well settled that in seeking the suppression of evidence the burden of proof is upon

the defendant to display a violation of some constitutional or statutory right justifying

suppression." <u>United States v. Rodriguez-Suazo</u>, 346 F.3d 637, 643 (6th Cir. 2003) (quoting

<u>United States v. Feldman</u>, 606 F.2d 679 n. 11 (6th Cir. 1979).

Here, in light of the parties' arguments, three separate issues must be discussed: the

automobile exception to the warrant requirement of the Fourth Amendment; investigatory stops

made pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and traffic

stops made on the basis of civil infractions. As discussed below, this court finds that the

evidence in this case should not be suppressed because, on the basis of the collective knowledge

of the law enforcement officers involved, the traffic stop and search were proper pursuant to the

automobile exception. In the alternative, the evidence should not be suppressed because (1) the

traffic stop was either a lawful <u>Terry</u> stop based on reasonable suspicion of criminal activity or a

lawful traffic stop based on probable cause to believe that a civil traffic violation had occurred;

and (2) the subsequent seizure was proper under the plain view doctrine.

### A. Automobile Exception

"[A] search conducted without a warrant issued upon probable cause is *per se*

unreasonable, ... subject only to a few specifically-established and well-delineated exceptions."

Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal

quotation marks omitted).  One specific and well-delineated exception is the automobile

exception.  "Under this exception, 'in cases where there was probable cause to search a vehicle[,]

a search is not unreasonable if based on facts that would justify the issuance of a warrant, even

though a warrant has not been actually obtained.'"  United States v. Cope, 312 F.3d 757, 775

(6th Cir. 2002) (quoting Maryland v. Dyson, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d

442 (1999) (emphasis omitted).  "The automobile exception is applicable even in nonexigent

circumstances, so long as the vehicle is mobile and law enforcement officers have probable

cause to believe that it contains incriminating evidence."  Cope, 312 F.3d at 775 (citing Dyson,

527 U.S. at  466-67).  See also United States v. Ross, 456 U.S. 798, 807-09, 102 S.Ct. 2157, 72

L.Ed.2d 572 (1982) (holding that, in accordance with the "automobile exception" to the warrant

requirement, an officer's warrantless search of a vehicle does not violate the Fourth Amendment

if the officer has probable cause to believe that a vehicle contains contraband.)  "The test for

'probable cause' is simply whether there is a fair probability that contraband or evidence of a

crime will be found in a particular place."  United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir.

1998) (internal quotation marks omitted).  "Probable cause is defined as "reasonable grounds for

belief, supported by less than *prima facie* proof but more than mere suspicion."  United States v.

Smith, 510 F.3d 641, 647-648 (6th Cir. 2007) (internal quotation omitted).  The court's

determination of whether probable cause existed at the time of the search is a "commonsense,

practical questionto be judged from the totality-of-the-circumstances."  Smith, 510 F.3d at 648

(internal quotation omitted).  "In determining whether there was probable cause, the court does

not look to events that occurred after the search or to the subjective intent of the officers; rather, the court looks at the 'objective facts known to the officers at the time of the search.'" Smith, 510 F.3d at 648 (quoting Smith v. Thornburg, 136 F.3d 1070, 1075 (6th Cir. 1998)).

In this case, while acknowledging that Special Agent Dziedzic did not personally conduct the search of Adams' vehicle, the government argues his basis for probable cause is still relevant and that the search was still proper pursuant to the automobile exception given the collective knowledge of the law enforcement personnel in this case. Courts evaluate the collective information of all the officers involved in determining whether their actions are proper, whether that action be an arrest, a search, or a Terry stop. See, e.g., United States v. Hensley, 469 U.S. 221, 232, 105 S.Ct. 675, 682 (1985) (concluding that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a Terry stop); United States v. Braggs, 23 F.3d 1047, 1049 (6th Cir. 1994) ("Reasonable suspicion can be based upon police officers' own observations or upon the collective knowledge of other officers."); United States v. Perkins, 994 F.2d 1184, 1187 (6th Cir. 1993) (upholding a search because "[c]ollectively, the officers in this case had ample probable cause to stop and search the vehicle being driven by [the defendant]."); United States v. Hensley, 713 F.2d 220, 223 (6th Cir. 1983), rev'd on other grounds, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) ((collecting cases and recognizing the general rule that "probable cause for arrest may emanate from collective police knowledge); United States v. Fofo, 39 Fed. Appx. 180, 183 (6th Cir. 2002) ((permitting a search pursuant to the automobile exception where there was no question that the collective knowledge of law

enforcement personnel cooperating on the case gave them probable cause to believe that heroin was being transported in the rental car); United States v. Valencia, 913 F.2d 378 (7th Cir.1990) (state officers' arrest of suspect based on DEA agent's probable cause suffices for fourth amendment inquiry). Moreover, in determining whether actions are proper, courts must evaluate the collective information of all the officers involved, including cooperating federal and local authorities. Feathers v. Aey, 319 F.3d 843 (6th Cir. 2003); Srisavath v. City of Brentwood, 243 Fed. Appx. 909 (6th Cir. 2007); Cansler v. City of Henderson, No. 4:06-CV-89-M, 2008 WL 4500041, *5 (W.D. Ky. October 2, 2008) (McKinley, J.).

In particular, where one law enforcement officer is directed to do something by another, the court must look at the first officer's knowledge in determining whether the second officer's actions were proper. See, e.g., Hensley, 469 U.S. 221; Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). In Hensley, a police officer conducted a traffic stop of the defendant's vehicle pursuant to a flyer, issued by another police department, stating that Hensley was wanted for investigation of an aggravated robbery. Hensley, 469 U.S. at 223. The United States Supreme Court subsequently held that, when a Terry stop is made in reliance on a flyer, the propriety of the stop turns on whether the officers who issued the flyer possessed a reasonable suspicion to make the stop and not on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance. Hensley, 469 U.S. at 229-233. Similarly, in Whiteley, a county sheriff in Wyoming obtained an arrest warrant for a person suspected of burglary and issued a message through a statewide law enforcement radio network describing the suspect, his car, and the property taken. At least one

version of the message also indicated that a warrant had been issued.  Whiteley, 401 U.S. at 564

and n. 5.  The message did not specify the evidence that gave the sheriff probable cause to

believe the suspect had committed the breaking and entering.  Whiteley, 401 U.S. at 562-564.  In

reliance on the radio message, police in Laramie stopped the suspect and searched his car.

Whiteley, 401 U.S. at 563. The United States Supreme Court ultimately concluded that the

sheriff had lacked probable cause to obtain the warrant and that the evidence obtained during the

search by the police in Laramie had to be excluded.  In so ruling, however, the Court noted:

> We do not, of course, question that the Laramie police were
> entitled to act on the strength of the radio bulletin.  Certainly
> police officers called upon to aid other officers in executing arrest
> warrants are entitled to assume that the officers requesting aid
> offered the magistrate the information requisite to support an
> independent judicial assessment of probable cause.  Where,
> however, the contrary turns out to be true, an otherwise illegal
> arrest cannot be insulated from challenge by the decision of the
> instigating officer to rely on fellow officers to make the arrest.

[Whiteley, 401 U.S. at 568.]  Thus, "had the sheriff who issued the radio bulletin possessed

probable cause for arrest, then the Laramie police could have properly arrested the defendant

even though they were unaware of the specific facts that established probable cause."  Hensley,

469 U.S. at 230-231 (describing the holding in Whiteley).

The reasons for examining the collective knowledge of law enforcement officers when

one officer directs another to do something is clear.  As stated by the Supreme Court:

> In an era when criminal suspects are increasingly mobile and
> increasingly likely to flee across jurisdictional boundaries, this rule
> is a matter of common sense: it minimizes the volume of
> information concerning suspects that must be transmitted to other

> jurisdictions and enables police in one jurisdiction to act promptly
> in reliance on information from another jurisdiction.

[Hensley, 469 U.S. at 231.]  Stated another way, "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."  Humphrey v. Mabry, 482 F.3d 840, 848-849 (6th Cir. 2007) (quoting Hensley, 469 U.S. at 231).

While law enforcement personnel need not provide one another with specific facts justifying an action when directing or asking for an action to be done, what is said does matter and it is the objective reading of a message that determines whether other law enforcement officers can defensibly act in reliance on it and what actions they can take.  See, e.g., Hensley 469 U.S. at 233 ("It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it.").  For example, in Hensley, the flyer twice stated that Hensley was wanted for investigation of an aggravated robbery, described both Hensley and the date and location of the alleged robbery, and asked other departments to pick up and hold Hensley for the St. Bernard police in the event he were located.  Hensley, 469 U.S. at 223.  The flyer also warned other departments to use caution and to consider Hensley armed and dangerous.  Hensley, 469 U.S. at 223.  Examining the flyer issued by the St. Bernard police, the Supreme Court determined that an objective reading of the entire flyer would lead an experienced officer to conclude that Hensley was at least wanted for questioning and investigation in St. Bernard, and that another officer could therefore rely on the flyer and

conduct a brief <u>Terry</u> stop to check Hensley's identification, pose questions, and inform the
suspect that the St. Bernard police wished to question him. <u>Hensley</u>, 469 U.S. at 234. An
experienced officer could also assume that a warrant might have been obtained in the period
after the flyer was issued and, accordingly, the flyer would further justify a brief detention at the
scene of the stop while officers checked whether a warrant had in fact been issued. <u>Hensley</u>, 469
U.S. at 234. As stated by the Supreme Court, "what matters is that the stop and detention that
occurred were in fact no more intrusive than would have been permitted an experienced officer
on an objective reading of the flyer." <u>Hensley</u>, 469 U.S. at 234-235. In particular, the Supreme
Court noted that, while the flyer asked other departments to pick up and hold Hensley for St.
Bernard instead of requesting that other police departments briefly detain Hensley merely to
check his identification or confirm the existence of a warrant, an objective reading of the flyer
might not justify such a detention, whether at the scene or at the Covington police headquarters,
given the distance involved and the time required to identify and communicate with the
department that issued the flyer. <u>Hensley</u>, 469 U.S. at 235. According to the Supreme Court,
"such a detention might well be so lengthy or intrusive as to exceed the permissible limits of a
<u>Terry</u> stop." <u>Hensley</u>, 469 U.S. at 235 (citation omitted). However, because such a situation did
not occur, the Supreme Court only held that the "flyer, objectively read and supported by a
reasonable suspicion on the part of the issuing department, justified the length and intrusiveness
of the stop and detention that actually occurred." <u>Hensley</u>, 469 U.S. at 235.

In <u>Blair</u>, a police officer, Officer Munday, was working in an undercover capacity and
observed an individual later identified as the defendant, Marcus Blair, engage in a hand to hand

transaction outside of a house and then drive away.  <u>Blair</u>, 524 F.3d at 744.  Officer Munday

believed the transaction to be drug related, but decided he lacked probable cause for an arrest

because he could not determine what items had been exchanged.  <u>Blair</u>, 524 F.3d at 744-745.

Officer Munday radioed another officer, Officer Holmes, of the possible drug transaction but did

not instruct Officer Holmes to pull Blair over.  <u>Blair</u>, 524 F.3d at 745.  Nonetheless, when

Officer Holmes saw Blair's car approach from the direction of the suspect house, Officer Holmes

pulled over Blair's vehicle upon suspicion that the "tag-light," or license plate light, was burned

out.  The officer also noticed that Blair was "'a little fidgety' and was reaching underneath the

seats of his vehicle."  <u>Blair</u>, 524 F.3d at 745.  The officer informed Blair that he had been pulled

over for a tag-light violation, obtained Blair's license, and ran a check revealing that Blair's

license was valid and that he had no outstanding warrants.  <u>Blair</u>, 524 F.3d at 745.  Officer

Munday, having heard Blair's name over the radio, informed Officer Holmes that during a

previous encounter Blair had been armed and had attempted to flee.  <u>Blair</u>, 524 F.3d at 745.

Officer Holmes then asked Blair for permission to search his car.  <u>Blair</u>, 524 F.3d at 746.  Blair

refused, and Officer Holmes continued to press, telling Blair that he was not under arrest, but

that the area was known for drugs and he had reason to believe Blair possessed narcotics.  <u>Blair</u>,

524 F.3d at 746.  Officer Munday then arrived and identified Blair's vehicle as the one Officer

Munday had observed.  <u>Blair</u>, 524 F.3d at 746.  Upon Blair's continued refusal to consent to a

search, Officer Holmes called in a canine unit. After the canine unit arrived, Officer Holmes

ordered Blair to exit the vehicle and observed Blair reach underneath the seats and toward his

ankle area as he was exiting the vehicle.  Blair, 524 F.3d at 746.  Officer Holmes told Blair to

stop reaching, searched him, and found several bags of crack cocaine.  Blair, 524 F.3d at 746.


With respect to the collective knowledge of the officers involved in Blair, the Sixth

Circuit held:

> The government contends that the hand-to-hand transaction could
> justify a Terry stop based on the collective knowledge of Officers
> Munday and Holmes.  We reject this argument.  The government
> cites United States v. Barnes, 910 F.2d 1342, 1344 (6th Cir. 1990),
> for the unremarkable proposition that one officer may conduct a
> Terry stop based on information obtained from another officer.
> According to Officer Holmes's own testimony, however, he did
> not obtain information regarding the hand-to-hand transaction until
> after the stop occurred.  The government's reliance on United
> States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d
> 604 (1985), is similarly misplaced, as the case is readily
> distinguishable.  In Hensley, the Court upheld a Terry stop by one
> police department premised on a "wanted" flyer issued by another
> department. The flyer contained information that the defendant
> was wanted for investigation of an aggravated robbery.  Id. at 223,
> 105 S.Ct. 675.  The Court concluded that because the department
> that issued the flyer had reasonable, articulable facts that would
> justify a Terry stop, the other department could rely on the flyer.
> Id. at 235., 105 S.Ct. 675.  In the case at hand, however, Officer
> Munday never communicated why Blair should be stopped, or
> even that he should be stopped at all. According to Officer
> Holmes, the only information he received prior to the stop was that
> a car was leaving the suspect house. As a result, Hensley does not
> apply.

[Blair, 524 F.3d at 751 -752.]

In this case, Special Agent Dziedzic testified that he coordinated a stop of defendant's vehicle and that he called a local police post, identified himself, stated that he was involved in larger investigation, and stated that he saw a suspect leaving a pharmacy with a bag. Special Agent Dziedzic also gave the police a description of the defendant's vehicle and requested a traffic stop. Trooper Taeff testified that the police dispatcher told him and his partner to stop a vehicle for the DEA, along with a vehicle description and a license plate number. Trooper Taeff also testified that they were told it was going to be a stop for prescription narcotics. Similarly, Trooper Henry testified that he and Trooper Taeff received instructions from dispatch to assist the DEA in a traffic stop. Trooper Henry also testified that the instructions stated that the DEA was following a vehicle that they wanted stopped and that there was some type of medication in the vehicle that the DEA wanted recovered. The instructions also described the vehicle in question.

Viewing the information communicated to the troopers objectively, they could defensibly act in reliance on that communication when stopping and searching Adams' vehicle. Special Agent Graber did not speak directly with them, but he did communicate with the local police post, identify himself, describe his investigation, and request a stop and search of defendant's vehicle. The police dispatcher did not tell the troopers everything either, but he did tell the trooper to stop defendant's vehicle and seize the prescription drugs. Defendant appears to argue that the troopers could not defensibly rely on the communication in justifying the stop and that the collective knowledge doctrine does not apply because the troopers were asked to find independent reasons to make the traffic stop. In particular, defendant notes that the police report

relating to this case omits any mention of the DEA's request and that it merely states that defendant was stopped for speeding.  However, while the DEA's request was omitted from the police report, the fact that the law enforcement officers concocted a ruse does not invalidate the probable cause justifying the search pursuant to the automobile exception.  See, *e.g.*, U.S. v. Rosario, 305 Fed. Appx. 882, 884 (3d. Cir. 2009) (upholding a search on the basis of the DEA's knowledge and without examining the purported state law reasons for the traffic stop where the DEA requested that the police search a vehicle, the police officer conducted a traffic stop, and the police report contained deliberate falsehoods in order to protect the confidentiality of the ongoing DEA investigation); U.S. v. Christopher, No. 03-CR-124-C, 2004 WL 63955, *3 (W.D. Wis. Jan. 5, 2004) (Crabb, J.) (holding that a search was constitutional even though the traffic stop at issue was never more than a cover story developed to protect a covert investigation).

   Given that the troopers could defensibly act in reliance on the directions of the police dispatch and the DEA when stopping and searching Adams' vehicle, the court must look at Special Agent Dziedzic's knowledge in determining whether the troopers' actions were proper. See, *e.g.*, Hensley,  469 U.S. 221; Whiteley, 401 U.S. at 568.  Based on the totality of the circumstances, Special Agent Dziedzic had probable cause to believe that defendant's vehicle contained contraband or incriminating evidence.  From the DEA investigation and wiretaps, Special Agent Dziedzic knew that George Williams and his associates, including defendant, were obtaining and distributing prescription drugs.  Moreover, Special Agent Dziedzic had learned that another DEA group had observed defendant, along with Darryl Williams, sell approximately 270 pills of Oxycontin on October 14, 2008.  On October 16, 2008, around 6:01

p.m., the DEA intercepted a phone call between George Williams and an employee at the East

Side Discount Pharmacy in which George Williams learned that an order was ready. A few

minutes later, the DEA intercepted a phone call between George Williams and defendant in

which George Williams instructed defendant to go to the East Side Discount Pharmacy and pick

up the order. Special Agent Dziedzic later observed defendant coming out of the pharmacy and

get into a Taurus, while carrying a dark shopping bag. Given that evidence, this court finds that,

based on the totality of the circumstances discussed above, probable cause clearly existed to

believe that defendant's vehicle contained contraband or incriminating evidence.

Therefore, based on the collective knowledge of the officers involved, the stop and

search of Adams' vehicle was proper pursuant to the automobile exception to the Fourth

Amendment's warrant requirement. Accordingly, defendant Adams' motion to suppress should

be denied.

### B. *Terry* Stop

In the alternative, even if the stop and search were not proper pursuant to the automobile

exception, defendant's motion should still be denied because the stop was a lawful Terry stop

and the pills were in plain view when seized. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20

L.Ed.2d 889 (1968), governs traffic stops  made on the basis of suspected criminal activity.

Pursuant to Terry, a warrantless encounter may be countenanced under the Fourth Amendment if

an officer has reasonable suspicion that criminal activity may be afoot. United States v.

Campbell, 549 F.3d 364, 370-371 (6th Cir. 2008). Reasonable suspicion "requires more than a

mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and

falls considerably short of satisfying a preponderance of the evidence standard.  If an officer

possesses a particularized and objective basis for suspecting the particular person of criminal

activity based on specific and articulable facts, he may conduct a <u>Terry</u> stop."  <u>Dorsey v. Barber</u>,

517 F.3d 389, 395 (6th Cir. 2008) (quoting <u>Smoak v. Hall</u>, 460 F.3d 768, 778-79 (6th Cir.

2006)).  A <u>Terry</u> stop must be supported by specific and articulable facts that would "warrant a

man of reasonable caution in the belief that the action taken was appropriate."  <u>Terry</u>, 392 U.S. at

21-22 (citations omitted).  In other words, "[t]he officer must be able to articulate more than an

'inchoate and unparticularized suspicion or hunch' of criminal activity."  <u>Illinois v. Wardlow</u>,

528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing <u>Terry</u>, 392 U.S. at 27, 88 S.Ct.

1868).  A court considers the totality of the circumstances to determine the validity of a <u>Terry</u>

stop.  <u>Blair</u>, 524 F.3d at 750.  During a <u>Terry</u> stop,  the officer may conduct a brief traffic stop

for investigative purposes and make reasonable inquiries to confirm or dispel his suspicions.

<u>United States v. Butler</u>, 223 F.3d 368, 374 (6th Cir. 2000).

As discussed above, the reasonable suspicion for a <u>Terry</u> stop can be based on the

collective knowledge of law enforcement officers.  <u>See</u>, *e.g.*, <u>Braggs</u>, 23 F.3d at 1049.

Moreover, where one law enforcement officer is directed to do something by another, the court

must look at the first officer's knowledge in determining whether the second officer's actions

were proper, so long as the second officer can defensibly act in reliance on the communication in

taking whatever actions he takes.  <u>Hensley</u>, 469 U.S. 221, 233.

Here, Troopers Taeff and Henry could defensibly act in reliance on the direction and

information given to them by dispatch in making a <u>Terry</u> stop.  Special Agent Dziedzic requested

that the police stop defendant's vehicle and he gave a brief synopsis of what was happening. Trooper Taeff testified that he was told to stop defendant's vehicle for prescription narcotics at the request of the DEA.  Similarly, Trooper Henry testified that he received instructions from dispatch to assist the DEA in a traffic stop and that the instructions stated that the DEA was following a vehicle, the DEA wanted the vehicle stopped, and there was some type of medication in the vehicle that the DEA wanted recovered.  Viewing that testimony objectively, the troopers could defensibly act in reliance on the communications they received in making a <u>Terry</u> stop of defendant's vehicle.  Morever, given that the troopers could rely on the communications and request in making a <u>Terry</u> stop,  the court must look at Special Agent Dziedzic's knowledge in determining whether the <u>Terry</u> stop was proper.  Here, as discussed above, Special Agent Dziedzic's knowledge gave him probable cause to believe that contraband was in defendant's vehicle and, consequently, his knowledge clearly meets the lesser reasonable suspicion standard for a <u>Terry</u> stop.

Defendant argues that, even if the initial stop was valid, the pills seized from the traffic stop must still be suppressed because it was a warrantless seizure and no exception to the warrant requirement applies.  Unless an exception applies, a warrant is generally required to permit law enforcement officers to search a place or seize an item. <u>United States v. McLevain</u>, 310 F.3d 434, 438 (6th Cir. 2002).  The law, however, "recognizes the plain view doctrine as an exception to the warrant requirement."  <u>United States v. Garcia</u>, 496 F.3d 495, 508 (6th Cir. 2007).  In order for the plain view doctrine to apply, the following four factors must be met: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object

can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." Garcia, 496 F.3d at 508. In this case, defendant argues both that the pills seized were not in plain view and that it was not readily apparent that the pills seized were contraband or intrinsically incriminating.

With respect to whether the seized bottles were in plain view, Trooper Taeff testified that, from his vantage point, he could see a black bag on the floor, but he could not see its contents and he does not recall its position. Trooper Taeff also testified that Trooper Henry had the better view of the front passenger's side floorboard. Trooper Henry testified that, from his position at the front passenger's side door, he saw a black shopping bag containing pharmacy bags on the front passenger's side floorboard. He also testified that, while he does not recall if the bag had handles, it was open enough so that Trooper Henry could see inside. According to Trooper Henry, the black bag was a thin shopping bag and it contained white paper bags like the type people receive medications in. The smaller white bags were stapled on the top and they had stickers or labels on them. Moreover, this court viewed the black bag in question and found it to be somewhat translucent. This court also notes that, if opened, the contents of the bag could be viewed from above.

On the basis of that evidence, this court finds that the seized evidence was in plain view. The troopers' testimony was credible on the issue of whether the evidence was in plain view and the testimony was also corroborated by this court's observations at the evidentiary hearing. Defendant appears to argue that the troopers are not credible because the police report relating to this incident omitted the DEA's request to stop the vehicle, but that information was omitted at

-28-

the request of the DEA so as not to compromise the ongoing investigation and, therefore, the police report does not lessen the troopers' credibility. Given the troopers' credibility, as well as this court's observations, the court finds that the seized evidence was in plain view.

Defendant also argues that it was not readily apparent that the pills seized were contraband or intrinsically incriminating. Determining whether the object's incriminating nature is "immediately apparent" does not require "an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir.1997) (quoting Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502,. 741-42 (1983)). The government bears the burden of proving the legality of a seizure under the plain view doctrine. United States v. Herndon, 501 F.3d 683, 692 (6th Cir. 2007). Additionally, in United States v. Garcia, 496 F.3d 495 (6th Cir. 2007), the Sixth Circuit explained:

> [I]n determining whether an object's incriminating nature is "immediately apparent," we look to three factors, none of which is necessary but each of which is instructive: (1) "a nexus between the seized object and the items particularized in the search warrant"; (2) "whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity"; and (3) whether "the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." [United States v. McLevain, 310 F.3d 434, 441 (6th Cir. 2002)] (quoting United States v. Beal, 810 F.2d 574, 576-77 (6th Cir. 1987)). In addition to these three factors, we have specifically held that an object's incriminating nature is not immediately apparent if it "appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity[.]" Shamaeizadeh v. Cunigan, 338 F.3d 535, 555 (6th Cir. 2003) (quoting McLevain, 310 F.3d at

443).  Moreover, the officer must recognize the incriminating nature of an object as a result of his "immediate" or "instantaneous sensory perception."

[Garcia, 496 F.3d at 510-511.]

Here, Trooper Henry observed a thin black shopping bag containing smaller white paper bags like the type given by pharmacies when filling prescriptions.  The smaller white bags were stapled on the top and they had stickers or labels on them.  As discussed above, a plain view seizure is "presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity" Calloway, 116 F.3d at 1133, and "the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature" Garcia, 496 F.3d at 510-511 (quoting McLevain, 310 F.3d at 441).  In this case, Trooper Henry recognized the smaller white bags as containing prescriptions and he knew that defendant was being investigated by the DEA, the DEA wanted the vehicle stopped, and there was some type of prescription medications in the vehicle that the DEA wanted recovered.  On the basis of those facts, Trooper Henry had probable cause to associate the bags with criminal activity and the subsequent seizure of the pills was therefore lawful pursuant to the plain view doctrine.

### C. Civil Infraction

A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred.  Blair, 524 F.3d at 748 (citations omitted).  Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion.  United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting United States v.

Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). Put another way, "[t]he requirements of probable cause are satisfied 'where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.'" United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005) (internal quotations omitted). When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant, Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and "police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).

Here, Trooper Taeff testified that, as he was following defendant's vehicle, he determined that it was speeding by pacing it for almost two miles. As described by Trooper Taeff, pacing a vehicle is basically staying behind it at the same distance for a period of time. By not gaining or falling behind from the vehicle as you pace, you can determine that you are going the same speed. Trooper Henry testified that Trooper Taeff did not tell Trooper Henry that he was pacing the vehicle and Trooper Henry was not looking at the speedometer as they followed the vehicle for one and a half miles. Trooper Henry also testified that dispatch did not say the stop had to be immediate and he read the request as the DEA wanting them to have their own reason for stopping defendant.

This court finds that Troopers Taeff and Henry had probable cause to believe that a civil traffic violation had occurred when stopping defendant. Both police officers were consistent in

their testimony relating to the traffic stop and this court finds them to be credible. Moreover, while the troopers were looking to stop defendant prior to any determinations of speeding, the troopers' "subjective intent for executing the stop is irrelevant. United States v. Torres-Ramos, 536 F.3d 542, 550 (6th Cir. 2008). See also United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995) ("[P]olice officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.").

If the troopers legally stopped defendant's vehicle on the basis that they had probable cause to believe that a civil traffic violation has occurred, then the subsequent seizure would be lawful under the plain view doctrine for the reasons discussed above.

## IV.  Conclusion

For the reasons discussed above, this court recommends that defendant Adams' motion to suppress be **DENIED** and that the evidence obtained or derived from the October 16, 2008 traffic stop not be suppressed. On the basis of the collective knowledge of the law enforcement officers involved, the stop and search were proper pursuant to the automobile exception to the Fourth Amendment's warrant requirement. In the alternative, the traffic stop was either a lawful Terry stop based on reasonable suspicion of criminal activity or a lawful traffic stop based on probable cause to believe that a civil traffic violation had occurred, and the subsequent seizure was proper under the plain view doctrine.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.


                              S/Virginia M. Morgan
                              Virginia M. Morgan
                              United States Magistrate Judge


Dated: March 10, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on March 10, 2010.

                              s/Jane Johnson
                              Case Manager to
                              Magistrate Judge Virginia M. Morgan